929 A.2d 1

**BAA, PLC, et al.**

v.

**ACACIA MUTUAL LIFE INSURANCE COMPANY, et al.**

No. 19, Sept. Term, 2006.

Court of Appeals of Maryland.

July 27, 2007.

138

James P. Ulwick (Kramon & Graham, P.A., on brief), Baltimore, for petitioners/cross-respondents.

Christpher J. Barber (Peter J. Meyer, Lionel W. Weaver, Gardner Carton & Douglas LLP, Chicago, Richard M. Kremen, Jodie E. Buchman, DLA Piper Gray Cary US LLP, Baltimore, on brief), for respondents/cross-petitioners.

Argued before BELL, C.J., RAKER, WILNER, HARRELL, BATTAGLIA, GREENE, ELDRIDGE and JOHN C. (Retired, Specially Assigned), JJ.

ELDRIDGE, J.

The principal issue in this case is whether Maryland's statutory accountant-client privilege [1] recognizes an exception for fraud in an action under the Maryland Uniform Fraudulent Conveyance Act.[2] The case also presents the issues of whether the accountant-client privilege was waived and whether goodwill may be considered an asset in assessing an entity's

---

**1.** Maryland Code (1974, 2006 Repl.Vol.), § 9–110 of the Courts and Judicial Proceedings Article.

**2.** Maryland Code (1975, 2005 Repl.Vol.), § 15–201 *et seq.* of the Commercial Law Article.

solvency under the Maryland Uniform Fraudulent Conveyance Act.

BAA, plc ("BAA") and World Duty Free, plc ("World" or, collectively, "BAA"), petitioners and cross-respondents, argue that no such fraud exception to the accountant-client privilege exists because the statutory enumeration of exceptions does not include a fraud exception. In addition, BAA asserts that the Court of Special Appeals erred when it concluded that the word "assets" in the Fraudulent Conveyance Act does not encompass goodwill.

The respondent and cross-petitioner corporate investors (the "Noteholders") are creditors of Duty Free International which was a subsidiary of BAA.[3] The Noteholders contend that, like the common law attorney-client privilege, the accountant-client privilege contains a fraud exception, and that the exception encompasses "fraud" within the meaning of the Fraudulent Conveyance Act. The Noteholders also assert that BAA waived the accountant-client privilege, thereby entitling the Noteholders to discovery of the accountant's work papers. Furthermore, the Noteholders argue that the Court of Special Appeals correctly held that goodwill should not be considered an asset because Duty Free's goodwill had no present fair market value.

We shall hold that the accountant-client privilege does not recognize an exception for fraud in an action under the Fraudulent Conveyance Act. In addition, we shall reject the Noteholders' waiver arguments. We shall also conclude that goodwill may be considered an asset in analyzing solvency under the circumstances presented in this case.

## I.

BAA, the corporate successor of the British Airport Authority, owns and manages airports, airport retail ventures, and

---

**3.** "Duty Free International," which was the Corporation's original name, has had several name changes during the relevant period. Hereafter, like the parties in this case, we shall refer to the Corporation simply as "Duty Free."

many related businesses, including duty-free shops. World is a wholly owned subsidiary of BAA, and is a holding company for BAA's duty-free businesses around the world. In 1994, Duty Free was a publicly traded Maryland corporation in the business of selling duty-free goods at international airports and other locations. Duty Free issued $115 million in notes in 1994 to raise capital for its operations. The notes paid interest at the rate of 7 percent, in semi-annual installments, with the principal obligation on the notes becoming due in January 2004. The respondents/cross-petitioners, the Noteholders, purchased $109,235,000 of the notes issued by Duty Free.[4]

In 1997, BAA purchased all of the outstanding stock of Duty Free for $24 per share. To effectuate the acquisition of Duty Free, BAA formed a new company, W & G Acquisition Corporation ("W & G"), as a subsidiary of World. BAA made a noninterestbearing loan to World of $662 million. In turn, World provided W & G with $225 million in equity capital, and turned over the remaining $437 million to W & G in the form of an interest bearing promissory note. W & G used the combined $662 million (the "Acquisition Debt") to purchase Duty Free's stock. W & G and Duty Free were then merged, with the result that Duty Free (the entity surviving the merger) became liable to BAA for the Acquisition Debt.

By June of 2000, BAA decided to sell Duty Free. BAA hired the accounting firm of Deloitte & Touche to prepare an audit of Duty Free's financial condition. BAA entered into negotia-

---

**4.** The Noteholders include the following investors: Acacia Mutual Life Insurance Company; Acacia National Life Insurance Company; Baird Aggregate Bond Fund, a series of Baird Funds, Inc.; Baird Core Bond Fund, a series of Baird Funds, Inc.; Balanced Fund, a series of First American Investment Funds, Inc.; Bond IMMDEX Fund, a series of First American Investment Funds, Inc.; California Public Employees Retirement System; General Electric Capital Assurance Company; Kansas City Life Insurance Company; Robert W. Baird & Company Incorporated; SEI Core Fixed Income Fund, a Series of SEI Institutional Managed Trust; SEI Core Fixed Income Fund, a series of SEI Institutional Investments Trust; The Prudential Insurance Company of America; Thornburg Limited Term Income Fund, a series of Thornburg Investment Trust; and U.S. Bancorp Asset Management.

tions for the sale of Duty Free with businessmen Simon Falic, Leon Falic, and Jerome Falic, who were brothers. The Falics hired the accounting firm of Arthur Andersen, LLP, to investigate Duty Free's assets. Arthur Andersen contacted Deloitte & Touche to review various work papers and documents prepared in connection with the latter's audit of Duty Free. Deloitte & Touche contacted Duty Free and BAA for permission to disclose the work papers and documents. BAA granted permission on the condition that the Falics and Arthur Andersen sign a confidentiality agreement regarding the information obtained from the review of the working papers. The Falics and Arthur Andersen agreed to this condition and signed the confidentiality agreement.

In August 2001, BAA reached an agreement in principle with the Falics for the sale of Duty Free, at a purchase price of $175 million, with the Falics assuming the $115 million obligation on the 1994 notes and paying the remaining $60 million in cash. The effect upon travel-related business resulting from the terrorist attacks on September 11, 2001, however, substantially impacted the value of Duty Free. Furthermore, there apparently may have been some misunderstanding among the parties concerning the August 2001 tentative agreement. Consequently, the Falics reduced their offer to $6 million, structured such that $5,999,999 was allocated to repayment of a portion of the balance of the Acquisition Debt and $1.00 was paid for Duty Free's stock. BAA accepted the Falics' offer, and a Purchase Agreement was entered into. Under the Purchase Agreement, the Falics did not personally assume the obligation under the 1994 notes, but the obligation remained with Duty Free.

## II.

In April 2002 the Noteholders filed, in the Circuit Court for Anne Arundel County, this action against BAA, World, Duty Free and the Falics. The Noteholders' complaint, as amended, contained three counts alleging "Violation[s] of the Maryland Fraudulent Conveyance Act," Code (1975, 2005 Repl.

Vol.), §§ 15–201 *et seq.* of the Commercial Law Article.[5] Other counts of the amended complaint asserted, *inter alia,* "Conspiracy," "Common Law Fraud" solely against BAA, and "Breach of Fiduciary Duty." [6] The relief requested included "[s]etting aside the transfer of any property or assets conveyed between or among defendants," compensatory damages, punitive damages, and a declaratory judgment.

The plaintiffs also demanded a jury trial. Prior to the submission of the case to the jury, the plaintiffs withdrew the

---

5. The Maryland Uniform Fraudulent Conveyance Act, §§ 15–201 through 15–214 of the Commercial Law Article, provides in relevant part as follows:

"**§ 15–201. Definitions.**

"(a) *In general.*—In this subtitle the following words have the meanings indicated.

"(b) *Assets.*—'Assets' means property of a debtor not exempt from liability for his debts.

"(2) 'Assets' includes any property to the extent that the property is liable for any debts of a debtor."

\*        \*        \*

"**§ 15–202. Insolvency.**

"(a) *In general.*—A person is insolvent if the present fair market value of his assets is less than the amount required to pay his probable liability on his existing debts as they become absolute and matured."

\*        \*        \*

"**§ 15–204. Conveyance by insolvent.**

"Every conveyance made and every obligation incurred by a person who is or will be rendered insolvent by it is fraudulent as to creditors without regard to his actual intent, if the conveyance is made or the obligation is incurred without a fair consideration."

\*        \*        \*

"**§ 15–206. Conveyance by a person about to incur debts.**

"Every conveyance made and every obligation incurred without fair consideration when the person who makes the conveyance or who enters into the obligation intends or believes that he will incur debts beyond his ability to pay as they mature, is fraudulent as to both present and future creditors."

"**§ 15–207. Conveyance made with intent to defraud.**

"Every conveyance made and every obligation incurred with actual intent, as distinguished from intent presumed in law, to hinder, delay, or defraud present or future creditors, is fraudulent as to both present and future creditors."

6. The asserted causes of action against Duty Free and the Falics were settled and dismissed, and they are no longer parties.

"conspiracy" count and the request for a declaratory judgment. Subsequently, they have indicated that their "claims" are limited to alleged violations of the Fraudulent Conveyance Act and "Breach of Fiduciary Duty." [7]

In essence, both in their amended complaint and at trial, the Noteholders contended that the various transactions involving Duty Free had been without fair consideration and had rendered Duty Free insolvent, thereby avoiding liability on the 1994 notes.[8] More specifically, the Noteholders asserted that Duty Free's incurrence of the $437 million Acquisition Debt and the subsequent repayment of $187 million of that debt constituted fraudulent conveyances because of a lack of fair consideration and because they made Duty Free insolvent.

Prior to trial, the Noteholders had served a subpoena on Deloitte & Touche, seeking documents associated with Deloitte & Touche's audit of Duty Free. Some documents were produced and others were withheld based on the statutory accountant-client privilege set forth in Maryland Code (1974, 2006 Repl.Vol.) § 9–110 of the Courts and Judicial Proceeding Article. Section 9–110(b) states in pertinent part:

"§ 9–110. Privileged communications—Accountants....

\* \* \*

"(b) *In general.*—Except as provided in subsections (c) and (d) of this section or unless expressly permitted by a client or the personal representative or successor in interest of the client, a licensed certified public accountant or firm may not disclose:

---

7. Plaintiffs' brief in the Court of Special Appeals at 1; plaintiffs' brief in this Court at 3–4. With regard to a cause of action for "Breach of Fiduciary Duty," *see Kann v. Kann,* 344 Md. 689, 706–714, 690 A.2d 509, 517–521 (1997). *See also International Brotherhood of Teamsters v. Willis Corroon Corp.* 369 Md. 724, 727 n. 1, 802 A.2d 1050, 1052 n. 1 (2002); *Insurance Company of North America v. Miller,* 362 Md. 361, 378–379, 765 A.2d 587, 596 (2001).

8. As noted by the Court of Special Appeals, at the time of trial, according to some of the parties, the unpaid principal on the 1994 notes was $39,235,000.00.

(1) The contents of any communication made to the licensed certified public accountant or firm by a client who employs the licensed certified public accountant or firm to audit, examine, or report on any account, book, record, or statement of the client;

(2) Any information that the licensed certified public accountant or firm, in rendering professional service, derives from:

(i) A client who employs the licensed certified public accountant or firm; or

(ii) The material of the client.

(c) *Disclosures.*—(1) A licensed certified public accountant or firm may disclose any data to another certified public accountant or firm that conducts a quality review.

(2) The disclosure permitted by paragraph (1) of this subsection:

(i) Does not waive the privilege required by subsection (b) of this section; and

(ii) Subjects a licensed certified public accountant or firm that conducts a quality review to the same duty of confidentiality applicable to the licensed certified public accountant or firm undergoing the quality review.

(d) *Exceptions.*—The privilege against disclosure required by subsection (b) of this section does not affect:

(1) The bankruptcy laws;

(2) The criminal laws of the State; or

(3) A regulatory proceeding by the State Board of Public Accountancy under §§ 2–317 and 2–412 of the Business Occupations and Professions Article."

After the refusal to produce certain documents, the Noteholders filed in the Circuit Court a motion to compel production, stating that a "fraud exception" to the accountant-client privilege had been recognized by the Court of Special Appeals in *Dixon v. Bennett,* 72 Md.App. 620, 531 A.2d 1318 (1987), *cert. denied,* 311 Md. 557, 536 A.2d 664 (1988), and that the exception was applicable. The Noteholders also argued that

BAA had waived the privilege in various ways. BAA, Deloitte & Touche and Duty Free opposed the motion, arguing that the Noteholders had not made an evidentiary showing of fraud and that there had been no waiver. In opposing the motion to compel, BAA also pointed out that the statute does not contain a "fraud exception" and that this Court had never recognized a "fraud exception" to the accountant-client privilege. The Circuit Court denied the motion to compel without comment.

Before the case was submitted to the jury, the Noteholders requested that the court instruct the jury on insolvency as follows:

> "In considering whether Duty Free was insolvent, you should consider the total amount of its assets and liabilities as of the time of the transaction. Goodwill is an intangible asset that has no liquidation or going concern value and, therefore, you must not consider goodwill in evaluating the solvency of Duty Free."

The Circuit Court refused to give this instruction and, instead, gave instructions to the jury making no reference to goodwill:

> "You have heard the term insolvency in his case. A person is insolvent if the present fair market value of his assets is less than the amount required to pay his probable liability on his existing debts as the[y] become absolute and matured."

> "In considering whether, in this case, Duty Free was insolvent, you should consider the total amount of its assets and liabilities as of the time of the relevant transactions."

The second sentence of the Circuit Court's instructions reflects the language of the Fraudulent Conveyance Act, § 15–202.[9] The jury returned a verdict in favor of BAA and World on all counts of the amended complaint.

---

**9.** Section 15–202(a) states that "[a] person is insolvent if the present fair market value of his assets is less than the amount required to pay his probable liability on his existing debts as they become absolute and matured."

The Noteholders appealed to the Court of Special Appeals, raising three issues. The Noteholders contended that the trial judge incorrectly denied their motion to compel the production of documents protected by the accountant-client privilege because the accountant-client privilege contains a fraud exception and that they had made "a *prima facie* showing that fraud had occurred." The Noteholders also argued that the trial judge erred because BAA had waived the accountant-client privilege. Finally, they claimed that the trial judge incorrectly rejected their proposed jury instruction requiring that the jury ignore goodwill as an asset for the purpose of making the solvency assessment.

The Court of Special Appeals, in an unreported opinion, "vacated" the judgment and "remanded" the case to the Circuit Court. Regarding the Noteholders' motion to compel, the Court of Special Appeals relied on its recognition, in *Dixon v. Bennett, supra,* 72 Md.App. at 638–643, 531 A.2d at 1327–1329, of a fraud exception to the accountant-client privilege. The intermediate appellate court quoted its earlier language from *Dixon,* reasoning that "[t]he rationale supporting the Federal [Courts'] repudiation of the attorney-client privilege under fraudulent circumstances is equally persuasive when applied to the accountant-client privilege." 72 Md.App. at 640, 531 A.2d at 1328. According to the Court of Special Appeals, to overcome a claim of accountant-client privilege under this judicially-created fraud exception, there must be "a prima facie showing that the advice related to the documents sought has been obtained in furtherance of a fraudulent activity, ... or the presentation of a reasonable basis for believing that the object was fraudulent. . . . The burden then shifts to the responding party to rebut the *prima facie* case." 72 Md.App. at 642, 531 A.2d at 1329. The Court of Special Appeals indicated that the Noteholders' allegations in their amended complaint satisfied the requirements of *Dixon* to overcome BAA's claim of privilege. The appellate court, however, rejected the Noteholders' contention that BAA had waived the privilege. The Court of Special Appeals concluded its discussion of the privilege issues as follows:

"In the event that, upon remand, appellants again move to compel production of the documents in question, the court must properly determine whether appellants have again presented a *prima facie* showing of fraud and, if so, must require appellees to bear their burden of rebutting that showing. In the event that appellees fail to rebut the showing, it will be necessary for the trial court to conduct an *in camera* review of the materials in question in order to ensure that confidential communications that are irrelevant to the issues at hand are not needlessly revealed."

As to the issue of goodwill, the Court of Special Appeals stated that the trial court should have granted the Noteholders' requested instruction which expressly precluded the jury from considering goodwill in the solvency analysis. The intermediate appellate court said that goodwill does not have any "present fair market value" within the meaning of § 15-202(a) of the Fraudulent Conveyance Act. Citing the testimony of expert and lay witnesses that goodwill cannot be separately bought, sold or borrowed against, the court concluded that goodwill does not possess any fair market value.[10]

---

**10.** The Court of Special Appeals' opinion and judgment are somewhat vague and, if affirmed, might present problems upon remand. The vacation of the Circuit Court's judgment seemed to be based on the privilege issue alone; the appellate court began its discussion of the jury instruction issue as follows:

"Although we shall remand on the basis of the accountant-client privilege, we shall consider, for the benefit of the parties and the court upon remand, appellants' challenge to the jury instruction on solvency."

While stating that the Circuit Court's ruling concerning the Noteholders' requested instruction on insolvency constituted error, the Court of Special Appeals at no point in its opinion or judgment indicated that there should be a new trial. A direction for a new trial was not implicit because the intermediate appellate court also stated that "there is some question as to whether appellants properly preserved their [jury instruction] argument for appellate review," but the Court of Special Appeals did not rule upon the appellees' contention that the issue had not been preserved. The entire judgment and the mandate were as follows:

"JUDGMENT VACATED; CASE REMANDED TO THE CIRCUIT COURT FOR ANNE ARUNDEL COUNTY. APPELLEES TO PAY THE COSTS."

BAA filed a petition for a writ of certiorari, presenting the following questions:

"1. Does Maryland recognize a fraud exception to the statutory accountant-client privilege set forth in § 9–110 of the Courts and Judicial Proceedings Article?

2. If a fraud exception exists, may it be invoked on the basis of allegations, rather than evidence, of fraud?

3. Are intangible assets such as goodwill 'assets' within the meaning of Md.Code . . . § 15–202(a)?"

The Noteholders filed both an answer and a separate conditional cross-petition for a writ of certiorari. The cross-petition presented the single question of "[w]hether the Court of Special Appeals erred in holding that BAA had not waived the accountant-client privilege. . . ." This Court granted both the petition and the cross-petition. *BAA v. Acacia*, 393 Md. 242, 900 A.2d 749 (2006).[11]

### III.

■ We shall first address the question of whether the statutory accountant-client privilege contains a "fraud exception" applicable in civil actions such as the instant case.[12]

---

A motion for reconsideration which, *inter alia*, pointed out these problems, was denied without opinion.

11. The issue of whether the accountant-client privilege contained a fraud exception had in a previous case been raised in this Court, but we did not reach the question in that case because there was not an adequate showing of fraud. *Sears v. Gussin*, 350 Md. 552, 568–569, 714 A.2d 188, 195–196 (1998).

12. In their brief in this Court, the Noteholders argue that BAA "waived" the argument that the privilege does not contain a fraud exception because BAA failed to make the argument before the trial court. (Brief of respondents/cross-petitioners at 9–12). The Noteholders made no such argument in the Court of Special Appeals, and the Court of Special Appeals decided on the merits the issue of whether the privilege has a fraud exception. More importantly, the Noteholders did not raise this particular waiver issue in their cross-petition for a writ of certiorari. Consequently, the issue is not before us. *See* Maryland Rule 8–131(b); *Boyd v. State*, 399 Md. 457, 473, 924 A.2d 1112, 1121 (2007); *Rhaney v. UMES*, 388 Md. 585, 596 n. 7, 880 A.2d 357, 363 n. 7 (2005); *Renbaum v. Custom Holding*, 386 Md. 28, 33 n. 2, 871 A.2d 554, 557 n.

■ As previously indicated, the accountant-client privilege is entirely a creature of statute in Maryland. Unlike the attorney-client privilege, Maryland common law does not recognize an accountant-client privilege. *Sears v. Gussin,* 350 Md. 552, 562, 714 A.2d 188, 192–193 (1998) ("At common law, no accountant-client privilege existed ..."). *See In re Special Investigation No. 236,* 295 Md. 573, 577, 458 A.2d 75, 76–77 (1983), tracing the history of the accountant-client privilege in Maryland and pointing out that the privilege is completely statutory, having its genesis in Ch. 585 of the Acts of 1924.

The statute creating the accountant-client privilege specifically addresses the matter of exceptions in § 9–110(d) of the Courts and Judicial Proceedings Article, stating:

"(d) *Exceptions.*—The privilege against disclosure required by subsection (b) of this section does not affect:

(1) The bankruptcy laws;

(2) The criminal laws of the State; or

(3) A regulatory proceeding by the State Board of Public Accountancy under §§ 2–317 and 2–412 of the Business Occupations and Professions Article."

---

2 (2005); *Edwards v. Corbin,* 379 Md. 278, 284 n. 3, 841 A.2d 845, 849 n. 3 (2004), and cases there cited.

Even if the issue were before us, the Noteholders' argument would have no merit. In the trial court, BAA's opposition to the Noteholders' motion to compel production stated as follows:

"Contrary to the assertion in the Plaintiffs' motion, the Maryland legislature has *not* expressly provided for a 'fraud exception' to the accountant-client privilege. In fact, it is unclear whether the *Dixon* court's recognition of that exception would be upheld by the Court of Appeals. In *Sears Roebuck & Co. v. Gussin,* 350 Md. 552, 568–569, 714 A.2d 188 (1998), the court declined to reach the question whether the fraud exception exists in Maryland, finding that *even if it exists,* the facts of that case would not support its application." (Emphasis in original).

Moreover, in the Court of Special Appeals, the Noteholders as appellants raised the issue of whether the privilege contains a fraud exception, arguing that "the fraud exception to the accountant-client privilege" is "recognize[d]," relying upon *Dixon v. Bennett,* 72 Md.App. 620, 531 A.2d 1318 (1987), *cert. denied,* 311 Md. 557, 536 A.2d 664 (1988) (appellants' brief in the Court of Special Appeals at 19).

The invocation of the privilege in this *civil* action under the Fraudulent Conveyance Act clearly does not "affect" the bankruptcy laws, Maryland's "criminal laws," or a regulatory proceeding by the State Board of Public Accountancy. While in some other contexts there might be a degree of ambiguity in the statute because of the word "affect," the language of § 9–110(d) plainly makes the exceptions inapplicable in a non-bankruptcy, non-criminal, and non-regulatory Accountancy Board proceeding, where neither the bankruptcy laws nor the criminal laws nor §§ 2–317 and 2–412 of the Business Occupations and Professions Article are involved.

■ Directly on point is the often-repeated principle that "[w] e neither add nor delete words to a clear and unambiguous statute to give it a meaning not reflected by the words the Legislature used or engage in forced or subtle interpretation in an attempt to extend or limit the statute's meaning." *Taylor v. NationsBank, N.A.,* 365 Md. 166, 181, 776 A.2d 645, 654 (2001). *See, e.g., Lamone v. Capozzi,* 396 Md. 53, 72, 912 A.2d 674, 685 (2006) ("this Court . . . first will look to the 'normal, plain meaning of the language,' and, if the language is clear . . ., it will not look past those terms," quoting *Bienkowski v. Brooks,* 386 Md. 516, 536, 873 A.2d 1122, 1134 (2005)); *Stoddard v. State,* 395 Md. 653, 668, 911 A.2d 1245, 1254 (2006) ("When interpreting a statute, the 'ordinary, popular understanding of the English language dictates interpretation of its terminology,'" quoting *Walzer v. Osborne,* 395 Md. 563, 572, 911 A.2d 427, 432 (2006)); *Blake v. State,* 395 Md. 213, 224, 909 A.2d 1020, 1026 (2006); *Sears v. Gussin, supra,* 350 Md. at 562, 714 A.2d at 192 ("The words of the statute [there the statute enacting the accountant-client privilege] should be given their ordinary and commonly understood meaning"); *In re Special Investigation No. 236, supra,* 295 Md. at 576, 458 A.2d at 76 ("[T]he Court considers the language of an enactment [there also the statute creating the accountant-client privilege] in its natural and ordinary signification. A corollary to this rule is that if there is no ambiguity or obscurity in the language of a statute, there is usually no need to look elsewhere to ascertain the intent of the General Assembly").

■  Moreover, when a statute expressly sets forth certain exceptions to the coverage of the enactment, this Court "cannot disregard the mandate of the Legislature and insert an exception, where none has been made by the Legislature," *Johnson v. Mayor & City Council of Baltimore City*, 387 Md. 1, 15, 874 A.2d 439, 448 (2005), quoting *Schmeizl v. Schmeizl*, 186 Md. 371, 375, 46 A.2d 619, 621 (1946). *See, e.g., Nasseri v. Geico*, 390 Md. 188, 198, 888 A.2d 284, 290 (2005) (Where there are "exceptions ... expressly authorized by the Legislature, this Court has consistently" refused to recognize "exceptions ... which were not authorized by the Legislature") (internal quotation marks omitted); *Selig v. State Highway Administration*, 383 Md. 655, 672, 861 A.2d 710, 720 (2004) (" 'When the legislature has expressly enumerated certain exceptions to a principle, courts ... should be reluctant thereafter to create additional exceptions,' " quoting *Ferrero Constr. Co. v. Dennis Rourke Corp.*, 311 Md. 560, 575, 536 A.2d 1137, 1144 (1988)); *O'Connor v. Baltimore County*, 382 Md. 102, 113, 854 A.2d 1191, 1198 (2004) ("We will not ... 'insert language to impose exceptions ... not set forth by the legislature' "); *Salamon v. Progressive Classic Insurance Company*, 379 Md. 301, 311–315, 841 A.2d 858, 864–867 (2004); *Lewis v. Allstate Ins. Co.*, 368 Md. 44, 48, 792 A.2d 272, 274 (2002).

The principle which precludes judicially inserted additional exceptions into statutes has been applied by this Court to statutory privileged communications. Thus, where the Court of Special Appeals held that public "policy" justified a particular exception to the statute creating a privilege for confidential communications between spouses, Code (1974, 2006 Repl.Vol.), § 9–105 of the Courts and Judicial Proceedings Article, this Court, in an opinion by former Chief Judge Robert C. Murphy, reversed, holding that the "public policy * * * argument, quite obviously, should be addressed to the legislature, not the courts." *Coleman v. State*, 281 Md. 538, 545, 380 A.2d 49, 54 (1977). With regard to the Court of Special Appeals' reliance upon a California *criminal* case holding the privilege inapplicable when the communication was made in furtherance of

criminal activity, Chief Judge Murphy responded (281 Md. at 545–546, 380 A.2d at 54, emphasis added):

"By statute in California there is an express statutory exception to the privilege between spouses for confidential communications made in furtherance of a crime. Authorities interpreting that state's law, which were relied upon by the Court of Special Appeals for its holding, are therefore wholly inapplicable, since the Maryland statute contains no such exception. Absent such an exception, the rule is that the privilege is applicable. *See State v. Pizzolotto*, 209 La. 644, 25 So.2d 292 (1946); *Dickinson v. Abernathy Furniture Co.*, 231 Mo.App. 303, 96 S.W.2d 1086 (1936). *Cf. Fraser v. United States*, 145 F.2d 139 (6th Cir.1944). *Indeed, the Maryland legislature has recognized the need for an express exception to a statutory privilege protecting communications between accountants and their clients. See* § 9–110(b) of the Courts Article, excepting from the privilege matters which 'affect the criminal laws of this state.'"

Turning to the three statutory exceptions to the accountant-client privilege, the only one which has been suggested as a basis for a civil fraud exception is the provision that the privilege "does not affect: * * * (2) The criminal laws of the State * * *" (§ 9–110(d)(2) of the Courts and Judicial Proceedings Article).[13] The meaning of this exception was specifically addressed by this Court in two companion cases, heard and decided at the same times, *In re Special Investigation No. 236, supra*, 295 Md. 573, 458 A.2d 75, and *In re Special Investigation No. 229*, 295 Md. 584, 458 A.2d 80 (1983). The decisions in those cases make it clear that the "criminal laws" exception would not apply in a purely civil action like the one at bar. Both *Special Investigation* cases involved investigations by the Attorney General of Maryland, authorized by the

---

**13.** *See Dixon v. Bennett, supra,* 72 Md.App. at 642, 531 A.2d at 1329 ("We believe that the same policy considerations underlying decision to invalidate the accountant-client privilege in the face of potential criminal violations apply when the client may be involved in the perpetration of a fraud").

Governor,[14] into allegations of criminal Medicaid fraud by health care providers. In connection with those investigations, the Attorney General had grand juries issue subpoenas to accountants to produce certain records. In *Special Investigation No. 236*, the Criminal Court of Baltimore[15] granted a motion for the return of the documents, and in *Special Investigation No. 229*, the Criminal Court of Baltimore granted a motion to quash the subpoena. The court orders in both cases were based upon the statutory accountant-client privilege. The Attorney General appealed in both cases, arguing that the exception based upon affecting the "criminal laws of the State" meant that "the accountant-client privilege is not applicable in criminal investigations."[16] This Court issued writs of certiorari prior to argument in the Court of Special Appeals. In *Special Investigation No. 236*, 295 Md. at 583, 458 A.2d at 80, we reversed, but in *Special Investigation No. 229*, 295 Md. at 585, 458 A.2d at 80, we dismissed the Attorney General's appeal.

After reviewing the language and history of the statutory privilege, Judge Marvin Smith for the Court in *Special Investigation No. 236*, 295 Md. at 577, 458 A.2d at 77, held that, under the "criminal laws" exception, the privilege is inapplicable in "a formal criminal proceeding." The Court went on to delineate the critical issue *(ibid.)*:

> "Thus, we turn to an examination of whether a grand jury proceeding is essentially criminal."

Upon a detailed examination of cases and other authorities concerning grand juries, as well as limitations upon the authority of grand juries, Judge Smith for the Court concluded (295 Md. at 583, 458 A.2d at 79–80):

---

14.  *See* Article V, § 3(a)(2), of the Constitution of Maryland.

15.  By constitutional amendment adopted in 1980 and effective January 1, 1983, the Criminal Court of Baltimore, along with certain other courts in Baltimore City, was replaced by the Circuit Court for Baltimore City. *See* Ch. 523 of the Acts of 1980.

16.  *See Briefs, Court of Appeals September Term 1982*, appellant's brief in No. 115 at 5, appellant's brief in No. 116 at 5.

"The conclusion is inescapable that at common law the grand jury was concerned with matters criminal. The only change in that procedure in Maryland is the four statutes we have cited. Hence, it was as a part of a criminal proceeding that the subpoena duces tecum was here issued. The statutory protection afforded as between accountants and their clients is thus not applicable. It follows, therefore, that the trial judge erred when he ordered return of the subpoenaed documents to the client of the accountant."

In *Special Investigation No. 229*, 295 Md. at 585, 458 A.2d at 80, however, even though the Attorney General's criminal investigation was continuing, the Court dismissed the appeal because "[t]he term of the grand jury in question has expired."

▇ The two *Special Investigation* cases involved allegations of *criminal fraud*, but what determined the applicability of the "criminal laws" exception to the accountant-client privilege was the nature of the existing judicial proceeding—whether it was criminal or civil. These cases confirm what is apparent from the statutory language. The "criminal laws" exception to the accountant-client privilege is inapplicable in a purely civil action such as the case at bar.[17]

---

**17.** Not only is the present case a civil action, but it is based on a section in the Fraudulent Conveyance Act which does not require an actual intent to defraud, § 15–204 of the Commercial Law Article. The Noteholders' brief in this Court characterizes their action under the Fraudulent Conveyance Act as follows (brief of respondents/cross-petitioners at 18):

"In this case, Plaintiffs sustained their burden of making a *prima facie* showing of fraud as a matter of law. Plaintiffs brought two causes of action under the Act alleging, *inter alia,* that Duty Free's incurrence of the $437 million Acquisition Debt and the repayment of the $187 million on that debt constituted fraudulent conveyances because: 1) Duty Free's incurrence of the $437 million Acquisition Debt rendered Duty Free insolvent; and 2) Duty Free did not receive fair consideration for incurring that debt or the subsequent repayments thereunder. (App. 68–69). The Act provides a remedy for such transactions, stating:
'[e]very conveyance made and every obligation incurred by a person who is or will be rendered insolvent by it is fraudulent as to creditors

■ The Court of Special Appeals' holding in *Dixon v. Bennett, supra,* 72 Md.App. at 638–643, 531 A.2d at 1327–1329, that the statutory accountant-client privilege contains a fraud exception applicable in civil actions under the Fraudulent Conveyance Act, will not withstand analysis. The intermediate appellate court in *Dixon* began its discussion of the accountant-client privilege issue by reviewing some federal court cases holding that the common law attorney-client privilege was inapplicable to "communications in furtherance of contemplated or ongoing criminal or fraudulent conduct." *Dixon,* 72 Md.App. at 639, 531 A.2d at 1327–1328.[18] The Court of Special Appeals then stated that the same "rationale" and "policy" supporting the federal courts' recognition of a fraud exception to the attorney-client privilege "is equally persuasive when applied to the accountant-client privilege." *Dixon,* 72 Md.App. at 640, 531 A.2d at 1328. The *Dixon* opinion continued (72 Md.App. at 641, 531 A.2d at 1328): "We do not propose to grant greater protection to the latter [accountant-client] privilege than that recognized for the former [attorney-client privilege]."

Addressing the fact that the accountant-client privilege is entirely statutory in origin, the Court of Special Appeals in *Dixon* acknowledged that, "generally ... we look to the plain meaning of the words." *Ibid.* Nevertheless, the *Dixon* opinion

---

without regard to his actual intent, if the conveyance is made or the obligation is incurred without a fair consideration.'
"MD.CODE ANN., COMMERCIAL LAW § 15–204."

**18.** At the time the *Dixon* opinion was rendered, this Court had not decided whether the Maryland common law attorney-client privilege contained a crime-fraud exception. In *Newman v. State,* 384 Md. 285, 309, 863 A.2d 321, 335 (2004), the Court, in an opinion by Judge Battaglia, held "that the crime-fraud exception applies in Maryland to exempt communications seeking advice or aid in furtherance of a crime or fraud, from the protection of the attorney-client privilege." The Court in *Newman,* however, rejected the State's argument that the crime-fraud exception to the attorney-client privilege should be viewed expansively. This Court has not held that the crime-fraud exception to the attorney-client privilege would apply to "fraud" within the meaning of § 15–204 of the Fraudulent Conveyance Act.

found an exception to the plain meaning principle (72 Md.App. at 641–642, 531 A.2d at 1328–1329, emphasis added):

> "But our inquiry does not always end there. Statutes are also to be construed reasonably with reference to the legislative purpose to be accomplished. *The real legislative intention should prevail over the intention indicated by the literal meaning. Kaczorowski v. Mayor & City Council of Baltimore,* 309 Md. 505, 516, 525 A.2d 628 (1987)."

Based upon the *Court of Special Appeals'* view of desirable "policy," the *Dixon* opinion concluded that the accountant-client privilege contained a fraud exception applicable in civil actions under the Fraudulent Conveyance Act.

The *Dixon* court's use of *Kaczorowski v. City of Baltimore, supra,* 309 Md. 505, 525 A.2d 628, as a basis for ignoring the language of the statute creating the accountant-client privilege, was erroneous. The *Kaczorowski* opinion was not a license for a Maryland court to disregard the plain language of a statute simply because of the court's view concerning better "public policy." The *Dixon* opinion overlooked those portions of *Kaczorowski* stating that, "in our efforts to discover purpose, aim or policy, we look at the words of the statute," 309 Md. at 513, 525 A.2d at 632, and that "[w]e do not mean to suggest that a court is wholly free to rewrite a statute merely because of some judicial notion of legislative purpose," 309 Md. at 516 n. 4, 525 A.2d at 633 n. 4.

The *Kaczorowski* opinion, to the extent that it may have sanctioned an examination of materials beyond the statutory language of a provision in an effort to ascertain legislative intent, was referring to *legislative* materials such as legislative history documents, the title of statutes, the provision in context of the statute as a whole, the provision's relationship to earlier legislation, revisor's notes, and similar materials, 309 Md. at 513–516, 525 A.2d at 632–633. *Kaczorowski* was not referring to a purely judicial notion of public policy. The *Dixon* opinion, however, did not rely upon any Maryland legislative materials.

Moreover, the cases in this Court since the *Kaczorowski* opinion have consistently cited and relied upon those portions of *Kaczorowski* which emphasize the importance of the enactment's language, instruct courts not to disregard the natural meaning of the statutory words, and warn courts not to rewrite statutes to reflect the courts' ideas of public policy. *See, e.g., Stanley v. State,* 390 Md. 175, 185, 887 A.2d 1078, 1084 (2005); *Price v. State,* 378 Md. 378, 387–388, 835 A.2d 1221, 1226–1227 (2003); *Tidewater/Havre de Grace, Inc. v. Mayor & City Council of Havre de Grace,* 337 Md. 338, 344–346, 653 A.2d 468, 472–473 (1995); *Fikar v. Montgomery County,* 333 Md. 430, 434–435, 635 A.2d 977, 979 (1994); *United States v. Streidel,* 329 Md. 533, 550–551, 620 A.2d 905, 914 (1993); *Jones v. Baltimore City Police Department,* 326 Md. 480, 489–490, 606 A.2d 214, 218 (1992); *State Roads Comm'n v. 370 Limited Partnership,* 325 Md. 96, 104, 599 A.2d 449, 453 (1991); *Prince George's County v. Burke,* 321 Md. 699, 706, 584 A.2d 702, 706 (1991).

The *Dixon* opinion's reliance upon out-of-state federal cases, dealing with the attorney-client privilege, was also misplaced. As earlier mentioned, the attorney-client privilege was recognized at common law; it "dates back in the common law to the reign of Elizabeth I," *Newman v. State,* 384 Md. 285, 301, 863 A.2d 321, 330 (2004). While codified in § 9–108 of the Courts and Judicial Proceedings Article, the codification of the attorney-client privilege simply reflects a recognition of the common law privilege.[19] The substantive law with respect to the attorney-client privilege is not set forth in a statute but remains a matter for case law. *See Harrison v. State,* 276 Md. 122, 135 n. 12, 345 A.2d 830, 838 n. 12 (1975) (noting that § 9–108 " 'is a statement of a common-law principle that has long been established' "). *See also, e.g., Newman v. State, supra,* 384 Md. at 301–311, 863 A.2d at 330–336; *E.I. du Pont de Nemours & Co. v. Forma–Pack,* 351 Md. 396, 414–421, 718

---

**19.** Section 9–108 in its entirety states:

"A person may not be compelled to testify in violation of the attorney-client privilege."

A.2d 1129, 1138–1140 (1998); *In re Criminal Investigation No. 1/242Q,* 326 Md. 1, 6–11, 602 A.2d 1220, 1222–1224 (1992); *State v. Pratt,* 284 Md. 516, 519–522, 398 A.2d 421, 423–424 (1979). On the other hand, as we have discussed, the accountant-client privilege is wholly statutory, with § 9–110 of the Courts and Judicial Proceedings Article setting forth in detail the substance of the privilege and specifically enumerating the exceptions. Case law under a particular common law principle is not a legitimate basis for judicially inserting an exception in a statute dealing with a different legal principle.[20]

Finally, the Court of Special Appeals' decision in *Dixon* concerning the accountant-client privilege cannot be reconciled with this Court's earlier decision in *In re Special Investigation No. 236, supra,* 295 Md. 573, 458 A.2d 75.[21] Accordingly, that portion of *Dixon v. Bennett,* 72 Md.App. at 638–643, 531 A.2d at 1327–1329, relating to the accountant-client privilege, is overruled. The accountant-client privilege has no fraud exception applicable under the circumstances here. In light of this holding, it is unnecessary to reach the second question in BAA's certiorari petition concerning the factual basis for invoking an exception to the accountant-client privilege.

## IV.

We agree with the Court of Special Appeals that the Noteholders failed to establish a waiver of the accountant-client privilege by BAA. The Noteholders maintain that BAA

---

**20.** Even if the federal case law relied upon in *Dixon* had involved the accountant-client privilege in other jurisdictions, rather than the attorney-client privilege, it would not have justified the decision in *Dixon.* *See Haas v. Lockheed Martin,* 396 Md. 469, 492, 914 A.2d 735, 749 (2007), where Judge Harrell for the Court recently stated:

"While it certainly is permissible to have recourse to federal law similar to our own as an aid in construction of Maryland statutory law, it should not be a substitute for the pre-eminent plain meaning inquiry of the statutory language under examination."

**21.** This Court's opinion in *In re Special Investigation No. 236* was not cited in the *Dixon* opinion. An examination of the briefs in *Dixon* discloses that *In re Special Investigation No. 236* was not cited by any party.

waived the privilege by issue injection, selective disclosure, and disclosure to third parties. The record reveals, however, that BAA consistently treated the communications with Deloitte and the accountant's documents as confidential.

■ This Court reviewed the accountant-client privilege and the matter of waiver in *Sears, Roebuck & Co. v. Gussin, supra*, 350 Md. 552, 714 A.2d 188. In *Sears*, Judge Raker for the Court stated that the privilege "regulates the conduct of the accountant, not the client, and is implicated when the accountant either voluntarily seeks to disclose, or is commanded to disclose, matters covered by the privilege." 350 Md. at 563, 714 A.2d at 193. The privilege may be waived by permission of the client and by the client's conduct. In addition, the *Sears* Court explained that "the privilege may be waived by the client's disclosure to third parties. The accountant-client privilege may also be waived by issue injection by the client in a lawsuit, when the client injects the professional activity or the advice of an accountant as an issue in a particular case." 350 Md. at 565, 714 A.2d at 194.

■ According to the Noteholders, BAA waived the privilege by issue injection when it referred to the Deloitte & Touche audit as "a critical part of BAA's defense to Plaintiffs' claim that Duty Free was insolvent at the time of the conveyance." (Brief of respondents/cross-petitioners at 34). To support their argument, the Noteholders point to a few instances from the trial where BAA made reference to Deloitte & Touche and their audit of Duty Free's financial condition. For example, during BAA's cross examination of an expert retained by the Noteholders, the following occurred:

"Q.  Now, in fact, this consolidated balance sheet—this is a balance sheet prepared by Duty Free, Right?  Their management?

"A.  Yeah. These are Duty Free's financial statements.

"Q.  And because it has been audited what that means is that Deloitte & Touche, as an independent auditing firm, has performed tests that are specified in the accounting

rules to verify and check the accuracy of the financial statement. Right?

"A. That's correct.

In addition, during BAA's direct examination of Russell Walls, the former Group Finance Director of BAA, the Noteholders point to the following exchange:

"Q. And this is the financial statement that was in fact separately audited by Deloitte & Touche. Is that right?

"A. Yes. And prepared under U.S. GAAP.[22]

&ast; &ast; &ast;

"Q. And when Deloitte & Touche audited Duty Free's financial statements, did they report back to you that Duty Free was insolvent?

"A. No."

██ The Noteholders acknowledge that it was they who raised the issue of Duty Free's solvency, but they emphasize that it was BAA's decision to refer to the Deloitte & Touche audit. Nonetheless, BAA's references to the audit were done only as part of its defense to Noteholders' claim of insolvency. The Noteholders fail to identify an instance where BAA referred to the audit for any purpose other than a defense to the Noteholders' insolvency contention. Furthermore, BAA's principal defense to the Noteholders' claim that Duty Free was insolvent at the time of the conveyances rested on the testimony of its expert witness who examined Duty Free's financial records, and the testimony of Duty Free and BAA employees who operated the company. We agree with the conclusion of the Court of Special Appeals that "it was [the Noteholders'] claims under the Act that necessarily injected the issue of Duty Free's solvency into the underlying litigation * * *. 'As a general rule, a party does not waive the [accountant-client] privilege by denying the opposing accusations . . . ,' " quoting *Sears*, 350 Md. at 567, 714 A.2d at 195.

---

**22.** The record indicates that the letters stand for United States Generally Accepted Accounting Principles.

■ The Noteholders also incorrectly argue that BAA waived the privilege by selective disclosure. Section 9–110(b)(1) of the accountant-client privilege prevents an accountant from disclosing "any communication made to the licensed certified public accountant or firm by a client...." Section 9–110(b)(2) prevents an accountant from disclosing "[a]ny information ... derive[d] from: (i) A client ... or (ii) The material of the client." The Noteholders assert that "BAA produced some of Deloitte's work papers but withheld others on the basis of the accountant-client privilege." (Brief of respondents/cross-petitioners at 41). In support of this assertion, the Noteholders refer to the affidavit of an accounting expert, Andrew Hayes, who reviewed the documents produced in discovery. In the affidavit, Mr. Hayes stated that "[c]ertain work papers were provided with respect to the audits of the March 1998, March 1999, March 2000, and March 2001 fiscal years.... The work papers provided consisted primarily of documents obtained from Duty Free or BAA plc ('BAA')." There was no further description of the papers which were provided. Instead, most of the affidavit relates to what was not provided.

The record reveals that BAA never ceased to treat the withheld materials as privileged and did not disclose materials subject to the privilege. The record shows that Deloitte was instructed "not to produce (1) documents that relate to confidential communications between Duty Free and Deloitte; and (2) documents that contain information that was derived from material provided by Duty Free." Furthermore, as the affidavit of Mr. Hayes discloses, the materials turned over to the Noteholders were documents from Duty Free or BAA—not Deloitte. Beyond that, the affidavit does not describe what was turned over. A waiver of the privilege by selective disclosure does not result from such a vague description of the documents which were disclosed.

■ There is likewise no merit in the Noteholders' argument that BAA waived the accountant-client privilege by disclosing privileged materials to third parties. The Note-

holders assert that BAA's disclosure of Deloitte's work papers to the Falics and their accountant, Arthur Anderson LLP, waived the accountant-client privilege. As previously indicated, "the privilege may be waived by the client's disclosure to third parties." *Sears, supra,* 350 Md. at 565, 714 A.2d at 194. Here, however, the disclosures were made because the Falics hired Arthur Anderson to perform a due diligence review of Duty Free's financial condition in connection with the Falics' proposed acquisition of Duty Free. Such disclosures do not waive the privilege. Section 9–110(c) states as follows:

"(c) *Disclosures.*—(1) A licensed certified public accountant or firm may disclose any data to another certified public accountant or firm that conducts a quality review.[23]

(2) The disclosure permitted by paragraph (1) of this subsection:

(i) Does not waive the privilege required by subsection (b) of this section; and

(ii) Subjects a licensed certified public accountant or firm that conducts a quality review to the same duty of confidentiality applicable to the licensed certified public accountant or firm undergoing the quality review."

In light of the pending acquisition of Duty Free, the Falics and BAA had a shared interest in the privileged documents. The Falics and Arthur Anderson, in conducting the due diligence review, were a part of the privileged relationship. Furthermore, when BAA made documents available to Arthur Andersen, it did so after the Falics signed a confidentiality agreement. The Falics agreed to the condition that "the information obtained as a result of the working papers will be limited to [the Falics'] consideration of the transaction [*i.e.,* the purchase of Duty Free's stock] . . . and will not be shared

---

**23.** Section 9–110(a)(7) defines "quality review" as follows:

" 'Quality review' means an independent appraisal, review, or study of the professional work of a licensed certified public accountant or firm in the practice of public accountancy that is made by a licensed certified public accountant or firm that is not affiliated with the licensed certified public or firm undergoing a quality review."

with any person other than Arthur Andersen LLP." Again, this confidentiality agreement evidences BAA's constant efforts to protect the confidential character of the documents. BAA did not waive the privilege by disclosure to the Falics and Arthur Andersen.

## V.

Turning to the issue of goodwill,[24] we disagree with the Noteholders and the Court of Special Appeals that goodwill cannot be considered in a solvency analysis under the Fraudulent Conveyance Act. The Noteholders argue that the Circuit Court erred in not giving their following proposed instruction to the jury:

---

**24.** Goodwill has been defined as follows *(Detter v. Miracle Hills Animal Hosp., P.C.,* 269 Neb. 164, 171, 691 N.W.2d 107, 113 (2005)):

"[T]he advantage or benefit which is acquired by an establishment beyond the mere value of the capital, stock, funds, or property employed therein, in consequence of the general public patronage and encouragement which it receives from constant or habitual customers, on account of its local position or common celebrity, or reputation for skill or affluence, or punctuality, or from other accidental circumstances or necessities, or even from ancient partialities or prejudices."

This Court in *Schill v. Remington Putnam Book Co.,* 179 Md. 83, 90, 17 A.2d 175, 178 (1941), quoting the opinion of the Supreme Court in *Old Dearborn Distributing Co. v. Seagram–Distillers Corp.,* 299 U.S. 183, 194, 57 S.Ct. 139, 144–145, 81 L.Ed. 109, 119 (1936), stated:

" 'And good will is property in a very real sense, injury to which, like injury to any other species of property, is a proper subject for legislation. Good will is a valuable contributing aid to business-sometimes the most valuable contributing asset of the producer or distributor of commodities and distinctive trade-marks, labels and brands, are legitimate aids to the creation or enlargement of such good will....' "

*See May v. May,* 214 W.Va. 394, 399, 589 S.E.2d 536, 541 (2003). In addition, "[g]oodwill is property of an intangible nature which constitutes a valuable asset of the business of which it is a part.... It is well settled that goodwill, being property, is transferable and may be bought and sold in connection with the sale of a business...." *Gilmore Ford, Inc. v. Turner,* 599 So.2d 29, 31 (Ala.1992). *See also Prahinski v. Prahinski,* 321 Md. 227, 582 A.2d 784 (1990); *Hagan v. Dundore,* 187 Md. 430, 50 A.2d 570 (1947); *Brown v. Benzinger,* 118 Md. 29, 84 A. 79 (1912).

"In considering whether Duty Free was insolvent, you should consider the total amount of its assets and liabilities as of the time of the transaction. Goodwill is an intangible asset that has no liquidation or going concern value and, therefore, you must not consider goodwill in evaluating the solvency of Duty Free."

In the instructions actually provided, the Circuit Court left the determination of whether to include goodwill to the jury. The jury was instructed as follows:

"You have heard the term insolvency in this case. A person is insolvent if the present fair market value of his assets is less than the amount required to pay his probable liability on his existing debts as the[y] become absolute and matured."

"In considering whether, in this case, Duty Free was insolvent, you should consider the total amount of its assets and liabilities as of the time of the relevant transactions."

Also, while not giving the Noteholders' proposed goodwill instruction, the Circuit Court allowed both sides to present expert testimony to the jury as to whether Duty Free's "goodwill" had any value.

The Noteholders argue that, with no value as an independent asset, goodwill cannot be considered in a solvency analysis under the Fraudulent Conveyance Act. Therefore, the Noteholders assert, the jury should have been instructed to exclude goodwill in determining Duty Free's solvency.

Nothing in the Fraudulent Conveyance Act, however, precludes the consideration of goodwill in a solvency determination. We therefore hold that the Circuit Court properly refused to instruct the jury that it must discount goodwill.

The statutory language of the Maryland Uniform Fraudulent Conveyance Act does not mention goodwill in defining insolvency. Section 15–202 of the Act states as follows:

"(a) *In general.*—A person is insolvent if the present fair market value of his assets is less than the amount required to pay his probable liability on his existing debts as they become absolute and matured."

The Circuit Court used the exact language from § 15–202 in its jury instruction. The Act does not require that assets be valued on an individual basis. Section 15–201(b) defines "assets" as *"any* property of a debtor not exempt from liability for his debts." (Emphasis added). In addition, " '[a]ssets' includes *any* property to the extent that the property is liable for any debts of a debtor." (Emphasis added). The Fraudulent Conveyance Act says nothing about whether goodwill should be considered an asset in a solvency analysis and the trial court appropriately left that determination to the jury. The Noteholders would have this Court insert into the statute that assets must be valued individually rather than as a whole. Goodwill may well contribute to a fair market value when assets are valued as a whole.

The fact that goodwill may not have a fair market value as an independent asset does not exclude it from consideration as an asset. The statutory definition refers to "any property"— not property independently possessing a fair market value. Indeed, where a business is a "going concern," considering goodwill in a solvency analysis seems highly appropriate. There may be occasions, however, where it would be appropriate to exclude goodwill as an asset where a business is to be liquidated or is on its death-bed. See *Bay Plastics, Inc. v. BT Commercial Corp. (In Re Bay Plastics, Inc.)*, 187 B.R. 315, 330 (Bankr.C.D.Cal.1995) (stating that "in a liquidation bankruptcy case [goodwill] must be disregarded").[25]

Here, the business was a going concern, and the jury instructions were taken directly from the Fraudulent Conveyance Act's definition of insolvency. The Circuit Court properly refused the Noteholders' insolvency instruction because it

---

**25.** In fact, the cases cited by the Noteholders on the issue of goodwill are from bankruptcy proceedings. See *Collins v. Kohlberg and Co. (In re Southwest Supermarkets LLC)*, 325 B.R. 417 (Bankr.D.Ariz.2005); *Bay Plastics, Inc. v. BT Commercial Corp. (In re Bay Plastics, Inc.)*, 187 B.R. 315 (Bankr.C.D.Cal.1995); *Webster v. Barbara (In re Otis & Edwards, P.C.)*; 115 B.R. 900 (Bankr.E.D.Mich.1990); *Kendall v. Sorani (In re Richmond Produce Co., Inc.)*, 151 B.R. 1012 (Bankr.N.D.Cal. 1993). None of these cases addressed goodwill in a situation where the business was a going concern.

would have incorrectly instructed the jury that it was required to discount an asset, goodwill, when such a determination should have been left as a question of fact for the jury.

For all of the foregoing reasons, the Circuit Court's judgment should be affirmed.

*JUDGMENT OF THE COURT OF SPECIAL APPEALS REVERSED. CASE REMANDED TO THE COURT OF SPECIAL APPEALS WITH DIRECTIONS TO AFFIRM THE JUDGMENT OF THE CIRCUIT COURT FOR ANNE ARUNDEL COUNTY. COSTS IN THIS COURT AND IN THE COURT OF SPECIAL APPEALS TO BE PAID BY THE RESPONDENTS/CROSS PETITIONERS.*