33 A.3d 972

**Gregory ROBINSON**

v.

**BALTIMORE POLICE DEPARTMENT.**

No. 17, Sept. Term, 2011.

Court of Appeals of Maryland.

Dec. 20, 2011.

42

Michael Marshall (Schlachman, Belsky & Weiner, P.A., Baltimore, MD), on brief, for petitioner.

Ashley C. Moore, Associate Legal Counsel (Baltimore Police Department, Baltimore, MD), on brief, for respondent.

Argued before BELL, C.J., HARRELL, BATTAGLIA, GREENE, ADKINS, BARBERA, and JOHN C. ELDRIDGE (Retired, Specially Assigned), JJ.

BARBERA, J.

The Law Enforcement Officers' Bill of Rights (hereinafter "LEOBR") mandates that law enforcement agencies file administrative charges against a law enforcement officer "within 1 year after the act that gives rise to the charges comes to the attention of the appropriate law enforcement agency official." Md.Code (2003), § 3–106(a) of the Public Safety Article.[1] With this case, we determine when the limitations period set forth in § 3–106(a) begins to run for a charge that is based on a materially false statement that a law enforcement officer makes during an administrative investigation of suspected misconduct by the officer. For the reasons that follow, we hold that the limitations period begins when the officer makes the false statement, not when the earlier misconduct that underlies the investigation was alleged to have occurred.

## I.

On February 22, 2007, an officer of the Baltimore Police Department (hereinafter "BPD") arrested Teressa Houssain[2]

---

1. All statutory references herein are to the 2002 volume of the Public Safety Article.

2. The record contains various spellings of Ms. Houssain's name. We shall adopt the spelling used in both the administrative charging docu-

on a charge of prostitution. During the arrest, Ms. Houssain revealed that she had recently engaged in sexual intercourse with a "Sergeant Steve Robinson" of the BPD. The BPD's Internal Investigation Division (hereinafter "IID") confirmed that the person with whom Ms. Houssain had the sexual encounter is Gregory Robinson (hereinafter "Petitioner").

Ms. Houssain alleged the following in a subsequent interview with the BPD conducted on February 22, 2007: Three days earlier she approached a silver sports utility vehicle in the southwestern area of Baltimore City. Inside the vehicle was Petitioner, who introduced himself as "Steve" and propositioned her for sex. Ms. Houssain agreed to the proposition. Petitioner then drove the two of them a few blocks to an empty Park and Ride lot. At that point, Petitioner showed Ms. Houssain a Baltimore City Police Identification Card with the last name "Robinson" printed on it, and he explained that he was a police officer. Ms. Houssain feared that she would be arrested, but after a few minutes of conversation Petitioner stated that "they could have sex now." He and Ms. Houssain entered the back seat of the SUV, where they engaged in sexual intercourse. Ms. Houssain specified that, during the intercourse, Petitioner brandished his firearm, but he never pointed the gun directly at her.

The matter was referred to the IID of the BPD later on February 22, 2007. When it was discovered that the incident involving Ms. Houssain and Petitioner occurred in Baltimore County, not Baltimore City as originally thought, the matter was forwarded to the Baltimore County Police Department to determine whether criminal charges should be brought against Petitioner. The next day, February 23, 2007, detectives from the Baltimore County Police Department interviewed Ms. Houssain and concluded that her criminal allegations were "unfounded." Having no criminal conduct to pursue, the Baltimore County Police returned the matter to the IID, for it to continue its administrative investigation of the incident.

---

ment filed against Petitioner and the Court of Special Appeals's unreported opinion in this case.

During the ensuing investigation, the IID investigators retrieved video-camera footage of the Park and Ride lot where, and from the date on which, Ms. Houssain alleged the sexual assault occurred. The investigators also re-interviewed Ms. Houssain, interviewed potential witnesses from Johns Hopkins Hospital, investigated Petitioner's overtime records, and attempted to retrieve his phone records. On May 22, 2007, the IID served Petitioner with a Notification of Complaint, which stated: "[I]t is alleged that on February 19, 2007, you engaged in sexual misconduct while on duty."

The IID investigators interviewed Petitioner on July 11, 2007, and again on August 1, 2007. During those interviews, Petitioner claimed not to recognize or know Ms. Houssain and denied having any sexual contact with her. Petitioner told the investigators that on the day of the alleged encounter he was not driving a sport utility vehicle, as Ms. Houssain alleged, but rather was driving his personal sedan. He provided the investigators with EZ Pass documentation in support of that statement. Petitioner further explained that he chose to drive his personal sedan because his supervisor had trained him to use a personal vehicle while organizing prostitution sting operations. Petitioner also told the investigators that he was unfamiliar with the location of the alleged sexual encounter and had not been there on the date in question.[3]

The IID discovered through its investigation the apparent falsity of a number of the statements, material to the investigation, that Petitioner made during the July 11 and August 1 interviews. Specifically, the IID had information, gleaned from the above-described video-camera footage, that Petitioner and Ms. Houssain were together in his personally owned, silver-colored sport utility vehicle at the Park and Ride lot on the day in question, February 19, 2007. That information refuted Petitioner's statements to the investigators that he did not know Ms. Houssain, was not familiar with the Park and Ride lot where the sexual activity was alleged to have oc-

---

**3.** The facts of this case show that Petitioner's statements go well beyond a mere "general denial" of Ms. Houssain's allegations.

curred, and had not been driving his sport utility vehicle at the time of the alleged misconduct. That information in turn demonstrated as fraudulent the EZ Pass documentation that Petitioner had presented to the investigators. The IID further ascertained that, contrary to what Petitioner told the investigators, his supervisor had not trained him to use a personal vehicle in prostitution sting operations.

On June 26, 2008, the BPD administratively charged Petitioner with six violations of BPD General Orders. The charges arose out of Petitioner's alleged sexual conduct with Ms. Houssain on February 19, 2007 (Charges 1, 2, 4, and 5); his conduct over the course of his career with BPD (Charges 1 and 6); and his alleged false statements to IID investigators on July 11, 2007 and August 1, 2007 (Charge 3, hereinafter the "false statement charge"). The false statement charge, of interest to us here, was based on BPD General Order C–2, 2–88, Rule 1, Section 17, which provides: "No member of the department shall knowingly make any false statement or misrepresentation of any material fact, oral or written, under any circumstances, with the intent to mislead any person or tribunal."

The specifications to the false statement charge alleged that Petitioner made six false statements at the July 11, 2007 interview and three false statements at the August 1, 2007 interview, including a statement that he did not know Ms. Houssain and did not have sexual contact with her; a statement that he drove his personal sedan, rather than his sport utility vehicle, on the date that alleged misconduct occurred; a statement that he was unfamiliar with the Park and Ride area where the alleged misconduct took place; a statement that his supervisor instructed him to use personal vehicles when organizing prostitution sting operations; and production of EZ Pass documentation that proved to be fraudulent.

On July 11, 2008, a charging committee of the BPD reviewed the charges. That committee agreed with the IID's formal recommendation to terminate Petitioner.

Petitioner filed a Complaint and Petition to Show Cause in the Circuit Court for Baltimore City,[4] alleging that all six of the administrative charges were barred by the one-year statute of limitations set forth in § 3–106 of the LEOBR. That section provides:

(a) *In general.*—Subject to subsection (b) of this section, a law enforcement agency may not bring administrative charges against a law enforcement officer unless the agency files the charges within 1 year after the act that gives rise to the charges comes to the attention of the appropriate law enforcement agency official.

(b) *Exception.*—The 1–year limitation of subsection (a) of this section does not apply to charges that relate to criminal activity or excessive force.

Petitioner contended that the BPD learned of his encounter with Ms. Houssain on February 22, 2007; therefore, all charges arising from that encounter, including the false statement charge, must have been filed by February 22, 2008. Petitioner took the position that the alleged false statements were "part and parcel" of the February 19, 2007 misconduct. Petitioner added that the BPD had an administrative policy of treating false statement charges, for statute of limitations purposes, as an extension of the charges for the underlying misconduct, and the BPD was legally bound to follow that policy.

The BPD moved for summary judgment, arguing that the false statement charge was not time-barred under § 3–106(a), and, in any event, all the charges, including the false statement charge, came within the ambit of § 3–106(b), because all the charges related to "criminal activity." Petitioner filed an opposition and cross-motion for summary judgment. Perti-

---

4. See § 3–105 of the LEOBR, which provides in pertinent part:
   (a) *In general.*—A law enforcement officer who is denied a right granted by this subtitle may apply to the circuit court of the county where the law enforcement officer is regularly employed for an order that directs the law enforcement agency to show cause why the right should not be granted.

nent here, he continued to argue that all the charges were time-barred.

The cross-motions for summary judgment came on for a hearing. At its conclusion, the Circuit Court granted the BPD's cross-motion as it related to the false statement charge, ruling that it was filed within the one-year limitations window. The court otherwise denied the motion and cross-motion, ruling that there were disputes of material fact related to the remaining charges.

Petitioner voluntarily dismissed the balance of his claims in the Complaint (all of which related to the remaining charges).[5] He then appealed the judgment to the Court of Special Appeals, where he presented the same two arguments he had raised before the Circuit Court: (1) the false statement charge was time-barred because the one-year statute of limitations set forth in § 3–106 began to run on the date that the underlying incident came to the attention of the BPD (undisputedly, February 22, 2007), not on the dates that the respective false statements were made to the IID investigators; and (2) the false statement charge was brought in violation of the so-called *Accardi* doctrine [6] because, in Petitioner's words, the BPD "failed to adhere to its own policy of dismissing false statement charges that are charged with the same case num-

---

5. Following Petitioner's dismissal of the remaining claims in the Complaint, the BPD convened a Trial Board on Charges 1, 2, 4, 5, and 6. The Trial Board found against Petitioner on all those charges and terminated him from employment. Petitioner filed in the Circuit Court a petition for judicial review. Proceedings in that matter have been stayed pending resolution of this appeal.

6. The doctrine refers to *United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260, 74 S.Ct. 499, 98 L.Ed. 681 (1954), which stands for the proposition that "an administrative decision is subject to invalidation when the agency's 'failure to exercise its own discretion[ is] contrary to existing valid regulations.' " *Pollock v. Patuxent Inst. Bd. of Review*, 374 Md. 463, 467 n. 1, 823 A.2d 626, 628 n. 1 (2003) (quoting *Accardi*, 347 U.S. at 268, 74 S.Ct. 499); *see also id.*, 823 A.2d at 628 n. 1 (stating that, "[s]ubsequent to *Accardi*, in a series of cases the Supreme Court has recognized a rule of federal administrative law that requires, with some exceptions, an administrative agency to generally follow its own procedures or regulations").

ber as the underlying charges." The Court of Special Appeals, in an unreported opinion, rejected both arguments and affirmed the judgment of the Circuit Court.

Petitioner filed a petition for a writ of certiorari, which we granted to answer the following question:

Under the Law Enforcement Officers' Bill of Rights, does the same one-year statute of limitations date which began when the initial incident came to the agency's attention also apply to allegations of a false statement made during a subsequent Internal Investigation Division interview?

Notwithstanding that this question is limited to whether the false statement charge was time barred, Petitioner devoted a few pages of his opening brief to an entirely separate argument—that he is entitled to dismissal of the false statement charge because the BPD, in his words, "ignored its own internal policies" when filing that charge. The BPD likewise briefed the issue. We decline to address the argument, because Petitioner did not present the argument in a separate question in his petition for certiorari, and the argument is not embraced by the question he did present. *See* Md. Rule 8–131(b); *Garner v. Archers Glen Partners, Inc.,* 405 Md. 43, 60–61, 949 A.2d 639, 649 (2008) (stating: "[S]ince the time when this Court's jurisdiction became largely dependent upon the issuance of a writ of certiorari, we have consistently held that, in a case decided by an intermediate appellate court, we shall not consider an issue unless it was raised in a certiorari petition, a cross-petition, or the order by this Court granting certiorari"; and declining to address an issue that was "not raised fairly in an otherwise successful Petition," even though all parties had briefed the issue (internal quotation marks and citation omitted) (alteration in original)).

## II.

The question properly before us implicates LEOBR's statute of limitations, § 3–106, which provides that "a law enforcement agency may not bring administrative charges against a law enforcement officer unless the agency files the charges

within 1 year after the act that gives rise to the charges comes to the attention of the appropriate law enforcement agency official." Petitioner asserts that the act that gave rise to the false statement charge is the February 19, 2007 incident between him and Ms. Houssain, which came to the attention of the BPD on February 22, 2007, and, consequently, the false statement charge, filed on June 26, 2008, was time-barred. In support of that assertion, Petitioner suggests the following interpretation of the provision: The LEOBR is silent as to when the limitations period for a false statement charge is triggered, and, when the LEOBR is silent on an issue, it should be interpreted "in a manner that furthers procedural due process protections for the police officer, consistent with its legislative intent." Petitioner further posits that "it is reasonable to expect that the legislature, when enacting [§ 3–106(a)], wanted [the] one-year investigatory period to include investigations into [both the underlying misconduct] and charges of false statements arising from the underlying investigation."

The BPD, conversely, argues that the acts that gave rise to the false statement charge were the false statements Petitioner made on July 11 and August 1, 2007. And, given that the BPD could not become aware of the false statements before they were made, limitations began to run, at the soonest, on the earlier of those two dates, July 11, 2007. Therefore, the BPD asserts, its filing of the false statement charge on June 26, 2008 was within the one-year limitations period for that charge.

Resolution of the parties' dispute involves application of our oft-cited rules of statutory construction. Principal among them is the "cardinal rule" that we "ascertain and effectuate the real and actual intent of the Legislature." *State v. Johnson*, 415 Md. 413, 421, 2 A.3d 368, 373 (2010) (citation omitted). In doing so, we look first to the language of the statute to determine its "normal, plain meaning," and we "neither add nor delete language so as to reflect an intent not evidenced in the plain and unambiguous language of the statute." *Id.*, 2 A.3d at 373. If we conclude that "the

language of the statute is unambiguous and clearly consistent with the statute's apparent purpose, our inquiry as to legislative intent ends ordinarily." *Id.*, 2 A.3d at 373. In that situation, "we apply the statute as written, without resort to other rules of construction." *Id.*, 2 A.3d at 373. In all cases, though, we must give the statute "a reasonable interpretation, not one that is absurd, illogical, or incompatible with common sense." *Id.* at 422, 2 A.3d at 373.

██ There is no room in the plain language of § 3–106 for Petitioner's interpretation of it. Put simply, § 3–106 is a statute of limitations, nothing more or less. See *Baltimore Police Dep't v. Etting,* 326 Md. 132, 138, 604 A.2d 59, 62 (1992) (stating that the purpose of § 3–106 is to provide a finite time frame during which law enforcement officers must be concerned about potential charges (citing 1988 Md. Laws ch. 330, *Floor Report of the Senate Judicial Proceedings Committee* )). Section 3–106 does not even hint at establishing a framework for an investigative process, much less does it address, even implicitly, a relation back of subsequent, chargeable acts of misconduct by the subject officer that are made in response to, or connection with, an investigation of alleged prior misconduct. Moreover, Petitioner can point to nothing in our case-law or the legislative history of either the LEOBR generally, or § 3–106 specifically, that, in his words, would make it "reasonable to expect" as much from that section. Indeed, to arrive at Petitioner's interpretation of § 3–106, we would need to "add . . . language so as to reflect an intent not evidenced in the plain and unambiguous language of the statute," and "construe [the] statute with forced or subtle interpretations that . . . extend its application." *Johnson,* 415 Md. at 421, 2 A.3d at 373 (citation and quotation marks omitted).

Moreover, Petitioner's interpretation of § 3–106 could lead to absurd results, which we are enjoined by our rules of construction to avoid. *See id.* at 422, 2 A.3d at 373 (stating that we must avoid a construction of a statute that is "absurd, illogical, or incompatible with common sense" (citation omitted)). A hypothetical situation proves the absurdity. Suppose an officer makes a false statement during an interview con-

ducted pursuant to a departmental investigation of an incident that had come to the attention of the law enforcement agency eleven months and 28 days earlier. Suppose further that the falsity of that statement is not immediately apparent to the investigators, although subsequent investigation would reveal the falsity. Only one of two possible outcomes would follow. Either a charge alleging the falsity would be filed within one to three days thereafter (depending on the month), without benefit of an investigation that might show reasonable grounds for the charge, in anticipation that the falsity of the statement would eventually, in the language of § 3–106, "come[ ] to the attention of the appropriate law enforcement agency"; or the filing of the charge would be time-barred and thus, foregone. The first result ought never be countenanced, and the second would directly contravene the General Assembly's intent, reflected by § 3–113 of the LEOBR (which we shall next address more fully), to proscribe—and punish—material falsehoods made by an officer during a departmental investigation. Neither outcome could reasonably have been envisioned by the General Assembly in enacting § 3–106.

Rather, we agree with the BPD that the plain language of § 3–106(a) allows for only one reasonable interpretation: that "the act that gives rise to the charge[ ]" of making a false statement is the making of the false statement itself, not the incident that gives rise to an investigation during which the officer makes a false statement material to the investigation of the underlying incident. The General Assembly's inclusion of § 3–113 in the LEOBR informs our understanding of how the legislature intended the limitations provision to apply to this case. Subsection 3–113(a) expressly prohibits an individual from "knowingly mak[ing] a false statement, report, or complaint during an investigation or proceeding conducted under this subtitle," and subsection (b) makes the falsehood subject to the criminal penalties of § 9–501 of the Criminal Law Article.[7] To repeat, we doubt that the General Assembly would include § 3–113 in the LEOBR, yet intend that the

---

7. Maryland Code (2002), § 9–501 of the Criminal Law Article punishes the making of "a statement, report, or complaint that the person knows to be false as a whole or in material part, to a law enforcement officer."

conduct proscribed by that section be rendered a mere adjunct to an investigation of prior misconduct and thereby governed by the limitations associated with any charges that may be filed based on that prior conduct.[8]

■ We therefore hold that when a law enforcement officer knowingly makes a false statement, material to and during the investigation of prior misconduct, the officer commits an "act" that gives rise to a charge within the meaning of § 3–106(a); therefore, pursuant to that subsection, the appropriate law enforcement agency has one year from the day the false statement "comes to [its] attention" to bring a charge against the officer for making that false statement. Applying our holding to the facts here, the false statement charge brought against Petitioner on June 26, 2008, for false statements he made to the investigators on July 11, 2007 and August 1, 2007, came within the period of limitations set forth in § 3–106(a).[9]

**JUDGMENT OF THE COURT OF SPECIAL APPEALS AFFIRMED. COSTS TO BE PAID BY PETITIONER.**

---

**8.** Our conclusion is consistent with how limitations rules are applied in other areas of the law. In the context of discrimination, for example, retaliation claims are separate claims, though based on preceding acts. A retaliation claim requires an underlying act of engaging in protected activity (like complaining of unlawful discrimination), an adverse employment action, and a causal link between the two. *Ikossi–Anastasiou v. Bd. of Supervisors of La. State Univ.*, 579 F.3d 546, 551 (5th Cir. 2009). The statute of limitations for the retaliation claim begins to run at the time of the adverse employment activity, not at the time of the underlying protected activity. *See, e.g., id.* (holding that Plaintiff's claim of retaliation because of her complaint about sex discrimination was not time barred where the adverse employment action occurred within the statute of limitations, although the underlying claims were time barred). Similarly, a discrimination claim accrues "when the litigant first knows *or with due diligence should know* facts that will form the basis for an action." *Merck & Co. v. Reynolds*, 559 U.S. ——, ——, 130 S.Ct. 1784, 176 L.Ed.2d 582 (2010) (quotation mark omitted).

**9.** Our holding that the false statement charge falls within the limitations period of § 3–106(a) properly disposes of the sole issue in the case. We therefore need not reach the BPD's contention that the limitations period of § 3–106(a) is not applicable to the false statement charge because, pursuant to § 3–106(b), the charge comes within the exception for charges "that relate to criminal activity."