52 A.3d 94

Flora E. LIPITZ, et al.

v.

William A. HURWITZ.

No. 351, Sept. Term, 2011.

Court of Special Appeals of Maryland.

Sept. 4, 2012.

208

**210**

Shale D. Stiller (Kenneth S. Aneckstein, Joseph M. Peterson, DLA Piper, LLP (US), on the brief) Baltimore, MD, for appellant.

Lee B. Rauch (Kristin P. Herber, Tydings & Rosenberg, LLP, on the brief) Baltimore, MD, for appellee.

Panel: GRAEFF, KEHOE, and HOTTEN, JJ.

KEHOE, J.

Flora E. and Roger C. Lipitz, trustees of the revocable property trust of Flora E. and Roger C. Lipitz, sued William A. Hurwitz in the Circuit Court for Baltimore County, contending that Hurwitz breached his contract to buy the Lipitz home. The circuit court granted Hurwitz's motion to dismiss. Lipitz has appealed and presents four questions to this Court, which we have reworded:

1. Does Hurwitz qualify as a "member of the public" under MD.CODE ANN. REAL PROP. ("RP") § 11B–106?

2. Does the circuit court's interpretation of the Maryland Homeowners Association Act, see RP § 11B–101 et. seq., conflict with the purpose and plain meaning of the statute in violation of the absurdity rule?

3. Does the doctrine of equitable estoppel bar Hurwitz's right of cancellation of the contract?

4. Did Hurwitz violate the implied duty of good faith and fair dealing by terminating the contract?

The circuit court did not err. We affirm the circuit court's order granting Mr. Hurwitz's motion to dismiss.

FACTUAL AND PROCEDURAL BACKGROUND

On August 6, 2009, Mr. Hurwitz, as buyer, and Mr. and Mrs. Lipitz, as sellers, entered into negotiations for the sale of the Lipitz home at 3120 Blendon Road in Owings Mills, Maryland (the "Property") for $4,047,000. The residence is located within the Caves Valley Golf Club, a residential development. According to the complaint, at the time the parties contracted for the sale of the Lipitz home, Mr. Hurwitz already owned two properties located within the same development.

Lots within the Caves Valley Golf Club are subject to a declaration of covenants that impose restrictions upon the use and development of each lot. The declaration provides that each lot within the development is subject to annual and special assessments payable to Caves Valley Golf Club for the maintenance of common areas within the development. For this reason, the Maryland Homeowners Association Act ("the Act"), *see* MD.CODE ANN. REAL PROP. §§ 11B–101 *et seq.* (1974, 2010 Repl.Vol.), requires the seller of a lot to provide the buyer with various disclosures relating to the homeowners association and the seller's lot. *See* RP § 11B–106. If a buyer does not receive these disclosures, the buyer has a right to cancel the contract. RP § 11B–108.

In the negotiations for the sale of the Lipitz residence, both sides were represented by, and generally acted through, realtors. Eventually, Hurwitz, through his realtor, submitted a proposed contract of sale to the Lipitzes' realtor. The contract was in the standard form developed by the Maryland Association of Realtors and contained several addenda, including: (1) the Maryland Homeowners Association Act Notice to Buyer (the "HOA Notice") and (2) the Maryland Homeowners Association Act Disclosures to Buyer and Transmittal of Documents (the "HOA Disclosures"). (We will sometimes refer to the these documents collectively as the "HOA Addenda"). Pursuant to RP § 11B–106(a)(3), the HOA Notice must state, in bold and underscored type:

If you have not received all of the MHAA information [1] 5 calendar days or more before entering into the contract, you have 5 calendar days to cancel this contract after receiving all of the MHAA information. You must cancel the contract in writing, but you do not have to state a reason. The seller must also provide you with notice of any changes in mandatory fees exceeding 10% of the amount previously stated to exist and copies of any other substantial and material amendment to the information provided to you. You have 3 calendar days to cancel this contract after receiving notice

---

1. The "MHAA information" is the information that a seller must provide to a buyer pursuant to RP § 11B–106(b):

(b) *Information to be supplied by vendor.*—The vendor shall provide the purchaser the following information in writing:

(1) A statement as to whether the lot is located within a development;

(2)(i) The current monthly fees or assessments imposed by the homeowners association upon the lot;

(ii) The total amount of fees, assessments, and other charges imposed by the homeowners association upon the lot during the prior fiscal year of the homeowners association; and

(iii) A statement of whether any of the fees, assessments, or other charges against the lot are delinquent;

(3) The name, address, and telephone number of the management agent of the homeowners association, or other officer or agent authorized by the homeowners association to provide to members of the public, information regarding the homeowners association and the development, or a statement that no agent or officer is presently so authorized by the homeowners association;

(4) A statement as to whether the owner has actual knowledge of:

(i) The existence of any unsatisfied judgments or pending lawsuits against the homeowners association; and

(ii) Any pending claims, covenant violations actions, or notices of default against the lot; and

(5) A copy of:

(i) The articles of incorporation, the declaration, and all recorded covenants and restrictions of the primary development, and of other related developments to the extent reasonably available, to which the purchaser shall become obligated on becoming an owner of the lot, including a statement that these obligations are enforceable against an owner's tenants, if applicable; and

(ii) The bylaws and rules of the primary development, and of other related developments to the extent reasonably available, to which the purchaser shall become obligated on becoming an owner of the lot, including a statement that these obligations are enforceable against an owner and the owner's tenants, if applicable.

of any changes in mandatory fees, or copies of any other substantial and material amendment to the MHAA information which adversely affects you. If you do cancel the contract you will be entitled to a refund of any deposit you made on account of the contract.

Hurwitz signed the version of the contract submitted by his realtor. However, in subsequent negotiations, apparently conducted by the realtors, the proposed contract of sale was revised to strike the HOA Addenda. As a result, much of the information that a buyer is entitled to receive under the Act was not provided by the Lipitzes to Hurwitz. This revised contract was signed by both parties on August 6, 2009 and the parties agreed on a settlement date of November 2, 2009.

According to the complaint: "During the time period between the execution of the Ratified Contract of Sale and the November 2, 2009 agreed to Date of Settlement, Roger Lipitz made attempts to provide Mr. Hurwitz with information required by the Act. Mr. Hurwitz declined such information stating that he already had those materials." The complaint also asserts that: "Mr. Hurwitz, by virtue of his property ownership in the Caves Valley Golf Club development, had the same access as the Plaintiffs regarding the disclosure information required by the Act."

One day prior to the agreed-upon settlement date, Hurwitz's agent informed the Lipitzes' agent that Hurwitz did not plan on closing on the purchase. Counsel for Hurwitz then advised the Lipitzes that Hurwitz was canceling the contract and asserted that the contract was not enforceable because the statutory information required by the Act had not been provided.

The contract required mediation but it was unsuccessful. Mr. and Mrs. Lipitz sued Mr. Hurwitz for specific performance and breach of contract.[2] Hurwitz filed a motion to

2. On December 7, 2010, the Lipitzes sold the Property to a third party for less than the contract price with Hurwitz. Because of the sale, the

dismiss and the Lipitzes filed a motion for summary judgment. The circuit court conducted a hearing on the motions on March 29, 2011. After hearing argument from both parties, the circuit court granted Hurwitz's motion to dismiss. The circuit court found that the relevant provisions of the Act were "clear and unambiguous" and that Hurwitz "was entitled to cancel the contract" because "the statute in two different sections [RP § 11B–103 and RP § 11B–108(d) ] says that the rights may not be waived under the Act." The circuit court also found that no facts existed that could give rise to estoppel. This appeal followed.

STANDARD OF REVIEW

■ This case was disposed of on a motion to dismiss. In such a case, "a court must assume the truth of, and view in a light most favorable to, the non-moving party, all well-pleaded facts and allegations contained in the complaint, as well as all inferences that may reasonably be drawn from them. . . ." *RRC Northeast, LLC v. BAA Md., Inc.,* 413 Md. 638, 643, 994 A.2d 430 (2010). "Consideration of the universe of 'facts' pertinent to the court's analysis of the motion are limited generally to the four corners of the complaint and its incorporated supporting exhibits, if any." *Id.*

■ Moreover, "[w]here an order involves an interpretation and application of Maryland constitutional, statutory or case law, our Court must determine whether the trial court's conclusions are 'legally correct'. . . ." *Wash. Suburban Sanitary Comm'n v. Phillips,* 413 Md. 606, 618, 994 A.2d 411 (2010).

■ Several of the parties' contentions turn on questions of statutory construction. As Judge Zarnoch recently explained for this Court:

[I]ssue[s] of statutory construction [are often] resolvable on the basis of judicial consideration of three general fac-

Lipitzes dismissed the claim for specific performance on February 1, 2011.

tors: 1) text; 2) purpose; and 3) consequences. Text is the plain language of the relevant provision, typically given its ordinary meaning, viewed in context, considered in light of the whole statute, and generally evaluated for ambiguity. Legislative purpose, either apparent from the text or gathered from external sources, often informs, if not controls, our reading of the statute. An examination of interpretive consequences, either as a comparison of the results of each proffered construction, or as a principle of avoidance of an absurd or unreasonable reading, grounds the court's interpretation in reality.

*Town of Oxford v. Koste,* 204 Md.App. 578, 585–86, 42 A.3d 637 (2012) (citations omitted). Mr. and Mrs. Lipitz and Mr. Hurwitz disagree as to the plain meaning of the Act's text, the relevance of the Act's legislative history and whether application of the Act to their dispute yields an absurd or unreasonable result.

## DISCUSSION

Our discussion is divided into four parts. First, we consider whether Mr. Hurwitz is a "member of the public" (as that phrase is used in the Act) entitled to the protections of the Act. Second, we address whether a literal interpretation of the Act, as applied to the facts of this case, would lead to an absurd or illogical result in violation of the absurdity rule. Next, we must decide whether the Lipitzes can use the doctrine of equitable estoppel to avoid the disclosure requirements set out in the Act. Finally, we must determine whether Hurwitz violated the doctrine of good faith and fair dealing in cancelling the contract to purchase the Lipitz home.[3]

---

**3.** Before turning to the merits of the appeal, we discuss a procedural matter. The appendix to the Lipitzes' brief contains materials that are not part of the record. The relevant sections are labeled "Documents for Judicial Notice" and "Other Documents." The documents included in these sections are: (1) the Caves Valley Declaration of Covenants; (2) three deeds that correspond with the relevant properties in this case; and (3) three letters exchanged between the attorneys of the Lipitzes and Hurwitz. Hurwitz filed a motion to strike these materials.

### I. Member of the Public

■ Section 11B–106(a) of the Act states that "[a] contract for the resale of a lot within a development ... to a *member of the public* who intends to occupy or rent the lot for residential purposes, is not enforceable by the vendor unless" certain disclosures are provided by the vendor to the prospective purchaser. (Emphasis added).

The Lipitzes argue that Hurwitz cannot be considered "a member of the public" and thus is not entitled to the protections of the Act because Hurwitz "had been a member of the [Homeowner's Association] for nine years" and he "already possessed, or, as a 'lot owner' ... could readily obtain, all [the] information required by the statute." Thus, the Lipitzes maintain that the phrase "member of the public" refers to "outsiders," i.e. those people who do not already own property in the development.

Hurwitz responds that the normal plain meaning of the Act establishes that Hurwitz was a member of the public and that the phrase "member of the public, according to plain language, means an individual." Therefore, Hurwitz maintains that he is afforded the protections of the Act.

Our analysis of the issue is not in line with either party's reasoning.

We disagree with Hurwitz's contention that "member of the public" means "an individual," but we nonetheless conclude that there is nothing in the Act to indicate that "member of the public" excludes people like Hurwitz—i.e. prospective pur-

---

Rule 5–201(b) states that a court may take judicial notice of a fact that is "either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." The covenants and deeds are recorded in the Baltimore County land records and thus are capable of accurate and ready determination. We will deny Hurwitz's motion with respect to these materials and consider them as appropriate. The various correspondence between the parties' attorneys are not properly before this Court. They do not meet the requirements of Rule 5–201. We will grant Hurwitz's motion with respect to the letters sent between attorneys.

chasers who own a lot in the same subdivision as the seller—from the protections of the Act. The Lipitzes urge us to make a distinction that simply does not exist in the statute.

The Act does not define the term "member of the public." The Lipitzes ask us to consider the phrase in isolation; were we to do so, the term would be ambiguous. However, when we consider the phrase in the context of the statutory framework as a whole, as we must, the meaning of the language "member of the public" becomes clear. As stated in *Deville v. State,* 383 Md. 217, 223, 858 A.2d 484 (2004):

> Where the language of a statute is ambiguous or unclear, we examine legislative history, prior case law, and statutory purpose. A statute is ambiguous when there are two or more reasonable alternative interpretations of the statute. Ambiguous or equivocal statutory language requires us to consider not only the ordinary meaning of words, but also to interpret how that language relates to the overall meaning, setting, and purpose of an act. Therefore, when interpreting unclear language within a statute, we consider both the particular and broad objectives of the legislation, in addition to the overall purpose of the statutory scheme. In other words, we do not view the plain language in isolation, but analyze the entire statutory scheme as a whole.

(Citations omitted). Thus, the phrase "member of the public" must be interpreted in the context of its surrounding language and the context of the Act as a whole. *Id.*

RP § 11B–106 sets out procedures to be followed for, as stated in the provision's heading, the "initial sale of [a] lot in [a] development containing 12 or fewer lots." RP § 11B–107(a) sets out procedures to be followed for, as stated in the provision's heading, the "[i]nitial sale of [a] lot *not* intended to be occupied or rented for residential purposes." (Emphasis added).

Specifically, RP § 11B–106(a) states (all emphases added):

(a) Contract.—A contract for the resale of a lot within a development, or for the initial sale of a lot within a development containing 12 or fewer lots, to a *member of the public who intends to occupy or rent the lot for residential purposes,* is not enforceable by the vendor unless [certain disclosures are made]:

Contrast this usage with RP § 11B–107(a), which states (all emphases added):

(a) Contract.—A contract for the initial sale of a lot in a development of any size to a *person who does not intend to occupy or rent the lot for residential purposes* is not enforceable by the vendor unless [certain disclosures are made]:

The two statutory provisions have two primary differences: (1) RP § 11B–106(a) applies to "a member of the public," whereas RP § 11B–107(a) applies to "a person"; and (2) RP § 11B–106(a) applies to those *"who intend[ ] to occupy or rent the lot for residential purposes "* and RP § 11B–107(a) applies those *"who do[ ] not intend to occupy or rent the lot for residential purposes."* To be clear: the purpose of this contrasting language is to distinguish those who intend to live in the residence from those who do not intend to live in the residence. For example, RP § 11B–106(a) does not apply to a developer because a developer does not intend to occupy a lot for residential purposes. The statute's legislative history confirms this reading.

The Act was originally enacted as Chapter 321 of the Acts of 1987. The bill file of Chapter 321 contains a letter written by Roger D. Winston, Esquire, the former chair of the Subcommittee on Homeowners Associations of the Governor's Commission Condominiums, Cooperatives and Homeowners Associations, to Douglas Nestor, Esquire, then Legal Counsel to the House Judiciary Committee. In the letter, which was written prior to the enactment of the legislation, Mr. Winston recommended one substantive change to the then pending legislation: that the language "member of the public" be clarified so that it is readily apparent that the disclosure

requirements are different in "the situation where one developer conveys an entire parcel of land to another developer." Mr. Winston explained that "[t]he 'initial sale to member of the public' language was derived from the Maryland Condominium Act[, RP § 11–101 *et seq.*,] where such language had been interpreted by the Secretary of State's office as excluding sales in bulk to other developers." As the legislation was initially drafted, Mr. Winston stated that there was

> concern that since the phrase 'to members of the public' was not defined, it was possible that someone would interpret this as applying to all sales by developers, even sales to other developers. To alleviate this potential problem, I suggest that ... after the word 'public' the phrase 'who intends to occupy or rent the lot for residential purposes' be inserted.

Indeed, the clause "who intends to occupy for residential purposes" was added in several places in the Act to distinguish sales to developers from sales to non-developers. This is why RP § 11B–106 and RP § 11B–107 provide different sets of disclosures depending on whether the purchaser "intends to occupy or rent the lot for residential purposes," (i.e. is a non-developer) or "does not intend to occupy or rent the lot for residential purposes," (i.e. is a developer). The Act imposes different disclosure requirements upon a seller depending upon the buyer's reasons for purchasing the property. The Act does not distinguish between buyers who already own property within a development and buyers who do not. For us to conclude that the Act should be interpreted in the manner suggested by the Lipitzes would require us to read into the law a provision that simply does not exist.[4]

---

**4.** As stated by the circuit court:

> [I]t would have been so simple for the Legislature to write into this statute that members of the public excludes existing lot owners, if that's what [it] intended. That is a very simple declarative sentence that could have been included in this statute but was not.

The Court of Appeals recently rejected a similar attempt to read an exception into a statute in *Allen v. Dackman*, 413 Md. 132, 991 A.2d 1216 (2010). Dackman argued that he could not be liable under the

In their complaint, the Lipitzes allege that (1) Hurwitz owned two lots in the same subdivision as the Lipitz residence; (2) that Hurwitz's lot was subject to the same covenants as the Lipitz lot; and (3) that Hurwitz had access to all of the information that the Lipitzes were required to provide Hurwitz. Nonetheless, the fact remains that the relevant inquiry under the Act is what the seller is obligated to provide to the prospective buyer, not what the buyer might have already had in his possession, or could have possibly obtained from the Association through his or her own efforts. *See* RP § 11B–106(a) ("A contract for the resale of a lot within a development ... is not enforceable *by the vendor* unless ... *[t]he purchaser is given* ... the disclosures set forth in subsection (b) of this section.") (emphasis added); *see also* RP § 11B–106(b) ("The *vendor shall provide the purchaser* the following information in writing . . . .") (emphasis added).

This conclusion is consistent with an opinion of the Attorney General, "relat[ing] to the disclosures that sellers must make to buyers of houses in a development subject to the fees and restrictions of a homeowners association." 72 Op. Att'y 158, 158 (1987). In the opinion, Attorney General Curran stated the following about what is now RP § 11B–106 and RP § 11B–108, which govern disclosures and a buyer's rescission rights:

> The evident intent of [RP § 11B–108] is that a buyer be provided the facts that will allow the buyer to make a rational judgment about whether to contract for the particular house. This objective is satisfied so long as the buyer receives the required disclosures at a time when the buyer

---

Baltimore City Housing Code for a lead paint violation because "the Housing Code imposed no duty on those who owned dwellings but did not intend to lease them." *Id.* at 158, 991 A.2d 1216. The Court stated that "[w]e see nothing in the Housing Code that supports this argument," *id.* at 158, 991 A.2d 1216, and explained that "[t]he City Council could have ... stated that owners were only required to comply with the Code if they intended to lease their dwellings, but the City Council did not do so." *Id.* at 159 n. 21, 991 A.2d 1216.

still has an opportunity to decide whether to enter a binding contract.

* * * * * *

[T]he seller has a duty to obtain and disclose to the buyer, prior to the formation of the contract, all of the information described in RP § 11B–106(b)(1), (2), (3), and (5). If the seller does not know the information, or does not have a copy of a document that is required to be disclosed, the seller has a duty to obtain the information or the document and provide it to the buyer prior to the consummation of the contract.

* * * * * *

As the Governor's Commission observed, "since the owner can obtain certain information more easily than the purchaser, it was the Commission's belief that the owner should have the burden of providing at least a minimal amount of information concerning the Homeowners Association to the purchaser." 1986 Report at 9. Cf. Article 56, § 224(r) of the Maryland Code and COMAR 09.11.02.01D (real estate agent's duty 'to ascertain' and disclose material facts about property).

Thus ... if a seller knows that there are dues and knows that there are assessments, the seller is required to ascertain the exact dollar amount and may not leave the disclosure blank merely because he or she does not presently know the amounts. Similarly, a seller must obtain rules and regulations, rights of way, and by-laws and provide them to the buyer prior to the formation of a contract; the seller's failure to do so give the buyer the right to rescind under RP § 11B–107(a).

We agree with the Attorney General's reasoning. It supports our conclusion that the Lipitzes were required to provide Hurwitz with the relevant disclosures because Hurwitz was a member of the public who intended to occupy the lot for residential purposes.

Mr. and Mrs. Lipitz discuss several cases, including *SEC v. Ralston Purina Co.,* 346 U.S. 119, 73 S.Ct. 981, 97 L.Ed. 1494

(1953), *Gilewicz v. Home Indem. Co.,* 150 A.2d 627 (D.C.1959) and *Bates v. Wisconsin–Dept. of Workforce Development,* 636 F.Supp.2d 797 (W.D.Wis.2009), to support the position that the phrase " 'member of the public' distinguishes between those in need of protection (outsiders) and those not in need of a statute's protection (insiders)" and that "Hurwitz is an insider within the Caves Valley Development and does not require the protection of the HOA Act." We will not read such an "insider-outsider" distinction into the Act. As explained more fully *infra,* there are many sensible reasons why the General Assembly would keep the duty on the seller to provide a buyer with disclosures even if that buyer is currently an owner of a lot in the same development. Most importantly, the seller is in the best position to provide the buyer with the most recent, accurate and complete disclosures that are specific to the seller's unique lot. This policy avoids the situation where a buyer *thinks* he knows all of the information provided in the disclosures, but does not actually know this information. The "insider-outsider" distinction urged by the Lipitzes would undercut an underlying premise of the Act, namely, that as between buyers and sellers, sellers are in a better position to have ready access to the information required to be disclosed by the Act. We will not create such a distinction where one does not already exist.

## II. The "Absurdity Rule"

The Lipitzes, citing *Kaczorowski v. Baltimore,* 309 Md. 505, 525 A.2d 628 (1987), next argue that the Court of Appeals has consistently authorized a court's decision to depart from the plain meaning of a statute when, as stated in the Lipitz brief, "its literal application would lead to an 'absurd' or 'illogical' result in a particular case." They assert that it would be absurd to conclude that the General Assembly intended the phrase "member of the public" "to include a person who had already been a member of the private HOA for nine years and [who also] owned not one but two lots within that HOA."

Hurwitz, citing *BAA, PLC v. Acacia Mut. Life Ins. Co.*, 400 Md. 136, 929 A.2d 1 (2007), contends that the Court of Appeals has made clear that "[t]he *Kaczorowski* opinion was not a license for a Maryland court to disregard the plain language of a statute simply because of the court's view concerning better 'public policy.'" *BAA,* 400 Md. at 157, 929 A.2d 1. Indeed, as noted by Hurwitz, the *BAA* Court specifically stated that "the cases in this Court since the *Kaczorowski* opinion have consistently cited and relied upon those portions of *Kaczorowski* which emphasize the importance of the enactment's language, instruct courts not to disregard the natural meaning of the statutory words, and warn courts not to rewrite statutes to reflect the courts' ideas of public policy." *Id.* at 158, 929 A.2d 1.

These caveats notwithstanding, there is no question that an appellate court "must avoid a construction of a statute that is absurd, illogical, or incompatible with common sense." *Robinson v. Balt. Police Dep't,* 424 Md. 41, 51, 33 A.3d 972 (2011) (citation and quotation marks omitted). However, we conclude that, although the result in this case is harsh, it is not absurd. As the Lipitzes themselves recognize in their brief:

> The HOA Act is a consumer protection statute. Its purpose is to level the playing field of knowledge between a seller and a buyer. It accomplished that purpose by requiring a seller of property in an HOA development to furnish the buyer with certain information. If the seller did not furnish that information, the buyer could cancel the contract.

Up to this point, we agree with the Lipitzes. But the Lipitzes continue to state that "[i]t would be 'absurd illogical or incompatible with common sense' to assume that the General Assembly intended to grant the cancellation remedy to a buyer who was already a member of the HOA and therefore possessed equal knowledge of all of the relevant information." Here, we disagree with Mr. and Mrs. Lipitz.

As alluded to earlier, there are sound reasons why the Act should require a seller to provide disclosures even to a buyer who is already a member of the HOA. There are many

scenarios, as the circuit court noted, where such a buyer may still need to be provided with disclosures, namely: (1) if the buyer did not obtain the covenants when purchasing his previous home; (2) if the buyer did not use the previous lot for residential purposes; or (3) if the covenants and disclosures changed since the buyer last bought his previous home. Moreover, as explained by the circuit court, the same disclosures do not always apply to each lot in the subdivision: "there are disclosures required for the specific lot and by the specific owner of the property that only that owner of the property [can] give ... so even if this defendant had previously received the covenants, he would not have received the disclosures specific to the Lipitz lot previously ... I specifically refer you to Sections 11B–106(b)(2)(i), (ii), (iii) and (4)(i) and (ii)." [5] We agree with the circuit court.

The Lipitzes contend that "[t]he only information required by the HOA Act which is property specific ... is the amount of the monthly fees imposed by the Association on the Property and any pending claims against the Property." With regard to monthly fees, the Lipitzes assert that Hurwitz knew the fee information because the declaration that Hurwitz received when he bought his other two properties in the development "states that every property in the development bears the same fee."

This is a valid point but the argument assumes that the Act contemplates that every development subject to it imposes assessments in the same fashion as does the Caves Valley Golf Club. In reality, homeowners' association regimes can be, and are, structured in a wide variety of ways and there is certainly no statutory requirement that an association must charge the

---

**5.** The text of these provisions is found in footnote one. For the convenience of the reader, RP § 11B–106(b)(2)(i) refers to monthly fees; subsection (b)(2)(ii) refers to the total fees charged upon the lot during the prior fiscal year; subsection (b)(2)(iii) refers to a statement of whether any fees against the lot are delinquent; subsection (b)(4)(i) refers to the existence of unsatisfied judgments or pending lawsuits against the homeowners association; subsection (b)(4)(ii) refers to any pending claims against the lot.

same fees for every lot in the development. Because the disclosure provisions apply uniformly to all sales of all lots within all developments that are subject to the Act, a seller does not have the luxury of disclosing only the information useful to a particular buyer of a specific lot. The Lipitzes cannot prevail simply because Hurwitz may have had more knowledge in this case than most other buyers in a similar situation.

One final point on this matter. In their brief, the Lipitzes ask the following rhetorical question (emphasis added):

Is it reasonably conceivable that the General Assembly would grant to Hurwitz a right to cancel the contract at the last minute even though he *may* have twice received all of the relevant documents when he purchased his [other] properties and *had ready access to* all the books and records of the Association?

(Emphasis added). As we have discussed, this question eludes the heart of the matter. Regardless of what an individual purchaser may know, or what information such a purchaser may have access to, RP § 11B–106 places the duty on the seller to provide this information to the buyer. The Act does not require a buyer to obtain the relevant documents and disclosures. As the Lipitzes readily admit, the Act is a consumer protection statute; placing the burden on the seller to provide disclosures to the buyer, regardless of what that buyer may or may not already know, is consistent with the Act's purpose.

### III. *Equitable Estoppel*

The Lipitzes assert that Hurwitz should be estopped from using their failure to provide the HOA disclosures as a defense to their breach of contract action. Mr. Hurwitz responds to this contention in three ways. First, he argues that, under § 11B–106(a), he cannot be estopped from raising their non-compliance as a defense because the Lipitzes cannot enforce the contract. Second, he cites *Stambaugh v. Child Support Enforcement Admin.*, 323 Md. 106, 113, 591 A.2d 501

(1991) for the proposition that "one cannot be estopped from asserting the unenforceability of a contract which is against public policy and therefore invalid." Finally, Hurwitz contends that, on the merits of the equitable estoppel claim, the Lipitzes cannot establish the necessary elements because they "cannot be said to have acted with reasonable diligence, with reasonable reliance, and in good faith, all prerequisites to the invocation of equitable estoppel...."

We agree only with Hurwitz's third contention.

■■■ In making his first argument, Hurwitz points out that under § 11B–106(a) a contract is "not enforceable" by the seller unless the seller makes certain disclosures. Based on this language, Hurwitz asserts that "there is nothing to be estopped" because the "language is automatic and self-executing." This position is not consistent with Maryland law. Simply because a seller is not entitled to enforce a contract if the seller fails to provide the requisite disclosures to the buyer does not mean that that same seller cannot use equitable principles, in extreme cases, to obtain some form of relief if the buyer backs out of the contract. As the Lipitzes point out in their brief, Maryland courts have held that equitable estoppel can be asserted either as a defense to a cause of action or to bar another party from raising a defense. *See, e.g., Leonard v. Sav–A–Stop Serv.*, 289 Md. 204, 212, 424 A.2d 336 (1981); *Gregg Neck Yacht Club v. Kent County Comm'rs*, 137 Md.App. 732, 773, 769 A.2d 982 (2001). This principle has been applied to statutory defenses. *See, e.g., Cunninghame v. Cunninghame*, 364 Md. 266, 289–90, 772 A.2d 1188 (2001) (a personal representative can be estopped from asserting the statutory time limitation on presenting a claim against an estate); *Chandlee v. Shockley*, 219 Md. 493, 502, 150 A.2d 438 (1959) (same); *Friedman & Fuller v. Funkhouser*, 107 Md. App. 91, 107–12, 666 A.2d 1298 (1995) (a party can be estopped from raising a Statute of Frauds defense), *disapproved on other grounds by Pavel Enters. v. A.S. Johnson Co.*, 342 Md. 143, 166 n. 29, 674 A.2d 521 (1996).

In the same vein, we do not interpret § 11B–103 [6] as preventing the Lipitzes from raising their estoppel argument. Again, simply because the Act does not allow a buyer to waive his right to cancel a contract with the seller does not mean that a buyer, in certain extreme circumstances, cannot be estopped from asserting such statutory rights. Estoppel and waiver are related, but by no means synonymous. *See Gould v. Transamerican Associates,* 224 Md. 285, 295, 167 A.2d 905 (1961) ("Waiver is closely inter-related and intertwined with estoppel: ... waiver rests upon the intention of the party, while estoppel rests upon a detrimental change of position induced by the acts or conduct of the party estopped."); *see also Travelers Indem. Co. v. Nationwide Constr. Corp.,* 244 Md. 401, 413, 224 A.2d 285 (1966) ("Waiver is the voluntary surrender of a right; estoppel is the inhibition to assert it from the mischief that has followed. Waiver involves both knowledge and intention; estoppel may arise where there is no intent to mislead. Waiver depends upon what one himself intends to do; estoppel depends rather upon what he causes his adversary to do. Waiver involves the acts and conduct of only one of the parties; estoppel involves the conduct of both.") (citation and quotation marks omitted).

As for Hurwitz's public policy argument, we do not agree that the contract involved in this case is against public policy under the teachings of *Stambaugh.* That case involved "the validity of an agreement by a mother to waive arrearages in court ordered support for her children in exchange for a consent by her former husband ... to an adoption of the children by the mother's present husband." *Id.* at 108, 591 A.2d 501. The Court held that the agreement violated public policy and was unenforceable because, *inter alia,* such agreements are expressly prohibited by statute. The Court cited CJP § 3–602(a) and FL § 8–103 in stating that "the duty to

---

**6.** Section 11B–103 reads in pertinent part:

Except as expressly provided in this title, the provisions of this title may not be varied by agreement, and rights conferred by this title may not be waived.

support one's minor children may not be bargained away or waived," and FL § 5–327 and Article 27, § 35C to explain that "payments of compensation to a natural parent in exchange for that parent's consent to an adoption" are forbidden.

*Stambaugh* is inapposite because, in this case, the HOA Act clearly provides that a contract without disclosures is voidable (not void or unenforceable, like in *Stambaugh* ) at the option of the buyer, which option must be timely exercised. See § 11B–108. The contract in this case was not *per se* unenforceable; the agreement did not violate dictates of public policy.

The more pertinent authority is *Crane Co. v. Onley,* 194 Md. 43, 69 A.2d 903 (1949). In *Crane,* the Court held that a homeowner may be estopped from asserting that a contractor failed to follow the Mechanics' Lien law [7] when the homeowner induced him not to follow the law. *Id.* at 50, 69 A.2d 903. The Court stated that the contractor "in good faith did exactly what [the homeowner] told him to do and relied upon the representation made to him by [the homeowner]." *Id.* The homeowner was "absolutely precluded both in law and in equity from asserting the mechanics' lien to which it might have otherwise been entitled." *Id.* We follow *Crane* in reaching our decision on this issue. Hurwitz's attempt to distinguish *Crane* on the grounds that it did not involve a consumer protection statute is not persuasive. The Mechanics' Lien law is designed to protect suppliers and contractors. It serves the same purpose as a consumer protection statute. The distinction raised by Hurwitz is not a meaningful one.

 Hurwitz's third argument is that the Lipitzes have not adequately established the elements of equitable estoppel. Professor Dan B. Dobbs summarized the doctrine of equitable estoppel this way:

[A]n estoppel case has three important elements. First, the actor, who usually must have knowledge, notice or suspicion

---

7. The corresponding provisions of the current Mechanics' Lien statute are codified at RP §§ 9–104 and 9–105.

of the true facts, communicates something to another in a misleading way, either by words, conduct or silence. Second, the other in fact relies, and relies reasonably or justifiably, upon that communication. And third, the other would be harmed materially if the actor is later permitted to assert any claim inconsistent with his earlier conduct.

1 Dan B. Dobbs, DOBBS LAW OF REMEDIES, § 2.3(5) at 85 (2d ed.). This formulation of equitable estoppel is consistent with Maryland law. *Dickerson v. Longoria,* 414 Md. 419, 453–54, 995 A.2d 721 (2010); *Jurgensen v. New Phoenix Atl. Condo. Council of Unit Owners,* 380 Md. 106, 125, 843 A.2d 865 (2004). In short, the three elements of equitable estoppel are: (1) voluntary conduct or representation, (2) reasonable reliance, and (3) detriment. *Hill v. Cross Country Settlements, LLC,* 402 Md. 281, 310, 936 A.2d 343 (2007).

The Lipitzes contend that the aforementioned elements of estoppel are met because: (1) Hurwitz met "with Lipitz on several occasions shortly before the scheduled November 2 settlement" and told "him that he was eager to settle"; (2) Mr. Lipitz relied on Hurwitz's conduct "by permitting Hurwitz access to the Property"; and (3) Mr. Lipitz relied "to his detriment because Hurwitz's long delay in [canceling the contract] prevented Lipitz from obtaining another buyer."

Hurwitz responds that the Lipitzes "cannot be said to have acted with reasonable diligence, with reasonable reliance, and in good faith ... when [they were] represented by a licensed real estate agent, yet failed to make the disclosures required by the Act, and purported to make an agreement contrary to the Act's express language."

In *Jurgensen,* the owner of a condominium unit attempted to use the doctrine of equitable estoppel to acquire the exclusive use of a parking space at the condominium complex. 380 Md. at 110, 843 A.2d 865. Jurgensen contended that he should have been allowed to retain the parking space because he relied on representations of the condominium board that granted him the exclusive use of the parking space. *Id.* at 125, 843 A.2d 865. The Court rejected Jurgensen's estoppel

argument. The Court first noted that there was a statute in the Maryland Condominium Act, *see* RP § 11–101 *et seq.*, that stated that a parking space could only be changed from a general common element to a limited common element with "the unanimous written consent of all unit owners." *Id.* at 120, 843 A.2d 865. The Court stated that, even assuming Jurgensen's estoppel argument applied in a case "where a statute specifically requires the unanimous written consent of all unit owners in order to redesignate a general common element," Jurgensen "normally would have to show that respondent made a representation concerning his use of [the parking space] and that he detrimentally relied on that representation." *Id.* at 125, 843 A.2d 865. The Court concluded that Jurgensen's reliance on any alleged representation was not reasonable. *Id.* at 127, 843 A.2d 865.

The *Jurgensen* Court relied on *Mountain Lake Park Ass'n v. Shartzer*, 83 Md. 10, 13–14, 34 A. 536 (1896), where the Court held that a claim of equitable estoppel, with respect to the title of real property, could only succeed when:

> the party claiming to have been influenced by the conduct or declarations of another to his injury was himself not only destitute of knowledge of the true state of the title, but also of any convenient and available means of acquiring such knowledge. Where the condition of the title is known to both parties or both have the same means of ascertaining the truth, there can be no estoppel.

*Id.* at 126, 34 A. 536 (quoting *Mountain Lake*, 83 Md. at 13–14, 34 A. 536). The *Jurgensen* Court noted that Jurgensen "had the means of acquiring the knowledge that [the] parking space . . . was . . . part of the general common elements of the Condominium" and that "[n]one of respondent's actions can be said to have made petitioner reasonably believe . . . that [the parking space] . . . would always be for the exclusive use of the owner of Unit 505." *Id.* at 126–27, 34 A. 536. The Court concluded that Jurgensen's claim did "not warrant application of estoppel principles." *Id.*

In the case before us, not only did the Lipitzes have the means of acquiring the disclosures (and the knowledge that they were required to provide the disclosures to a prospective buyer), but this information was actually given to them by Hurwitz's realtor. The initial offer from Hurwitz's realtor, which was in the form of a contract signed by Hurwitz, included the HOA Addenda and unambiguously stated that the contract would not be enforceable if the seller failed to prove the HOA Disclosures. Moreover, the applicable statutes explicitly state that the seller must provide the buyer with the relevant disclosures. We cannot say that the Lipitzes reasonably relied on any representation that Hurwitz may have made. Thus, we conclude that the circuit court was correct in not granting the Lipitzes relief based on equitable estoppel principles.

### IV. Good Faith and Fair Dealing

"Maryland law recognizes an implied duty of good faith and fair dealing as applied to the 'performance and enforcement' of the contract itself." *Polek v. J.P. Morgan Chase Bank, N.A.*, 424 Md. 333, 362, 36 A.3d 399 (2012). This duty has been summarized as "simply prohibiting one party to a contract from acting in such a manner as to prevent the other party from performing his obligations under the contract." *Id.* Although the *Polek* Court stated that this characterization may be under-inclusive, the Court stated that it is clear that "[a]bsent special circumstances ... no new obligations on the parties are imposed, where the contract is silent, by the implied covenant of good faith and fair dealing." *Id.* at 363, 36 A.3d 399.

Mr. and Mrs. Lipitz claim that Hurwitz violated the duty of good faith and fair dealing because they "had no reason to think that Hurwitz would use the elimination of the HOA addenda to enable him to cancel the Contract at his whim."

Hurwitz asserts that "an implied contractual duty of good faith cannot be used to overcome the language in this consumer protection Act that its rights cannot be waived or varied, and that if disclosures are not made, the Contract is not

enforceable." In this regard, *Parker v. Columbia Bank,* 91 Md.App. 346, 604 A.2d 521 (1992) is particularly instructive.

In that case, the Parkers approached Columbia Bank to finance the purchase of a lot and the construction of a new home. *Id.* at 352, 604 A.2d 521. Subsequently, "the Parkers and Columbia entered into a written construction loan agreement in the amount of $529,000 to cover the Parkers' purchase of the land and the construction loan." *Id.* at 355, 604 A.2d 521. "In administering the loan, Columbia did not adhere to the draw schedule set forth in the Parkers' construction contract with [the construction company]." *Id.* at 355, 604 A.2d 521. The Parkers alleged that Columbia represented that "construction draws would only be issued after Columbia had obtained inspections to insure that work had been done in accordance with the draw schedule, while in fact Columbia intended to advance funds, if requested by [the construction company], ahead of the draw schedule and regardless of inspections." *Id.* at 354, 604 A.2d 521. The Parkers asserted that Columbia Bank breached the express terms of their loan agreement and an implied duty of good faith "by disbursing draws when the loan was out of balance." [8] *Id.* at 365, 604 A.2d 521. The Court explained:

> [The loan agreement] does not prohibit Columbia from disbursing draws if the loan is out of balance; it merely provides that Columbia is not obligated to disburse draws when the loan is out of balance. By its terms, [the relevant provision of the loan agreement] is for Columbia's protection, not the Parkers'. Columbia was not contractually obligated to make sure that the Parkers' loan remained in balance. Rather, it was the Parkers who were obligated to maintain the loan in balance. Indeed, to the extent that the

---

**8.** The relevant provision of the loan agreement stated:

*Lender's Duty to Disburse*—Lender agrees, upon Borrower's compliance with all conditions precedent to the Opening of the Loan, and provided the Loan is in balance, to open the Loan hereunder and to continue to disburse the same so long as the Loan remains in balance and Borrowers have complied with all conditions precedent from time to time and is not in default hereunder.

loan became out of balance, the Parkers were expressly obligated, under Section 8.1 of the loan agreement, to invest additional funds in the project to rectify the problem.

*Id.* A similar situation exists here, except, in addition to the contract entered into between the Lipitzes and Hurwitz, there is also a statute that explicitly places duties on the seller. RP § 11B–106 is for Hurwitz's protection, not the Lipitzes'. Hurwitz was not contractually obligated to make sure that Mr. and Mrs. Lipitz provided him with the disclosures. Nor was he obligated to inform them that he had a right to cancel the contract if the disclosures were not received. It was the Lipitzes who were obligated to provide Hurwitz with the disclosures. Indeed, to the extent any disclosures or documents were missing from the contract materials, the Lipitzes were expressly obligated, under RP § 11B–106, to obtain these materials and give them to Hurwitz.

■■■ As stated *supra,* "[u]nder Maryland law, a duty of good faith and fair dealing is an implied term in certain contracts … but this duty simply prohibits one party to a contract from acting in such a manner as to prevent the other party from performing his obligations under the contract." *Parker,* 91 Md.App. at 366, 604 A.2d 521. Here, the Lipitzes have not alleged that Hurwitz prevented them from performing any of their obligations under the Act. To be sure, Mr. Lipitz does allege that he "made attempts to provide Mr. Hurwitz with information required by the Act" but that "Mr. Hurwitz declined such information stating that he already had those materials." This, however, does not change the fact that the parties agreed "to strike the HOA Addenda from the contract." Regardless of Hurwitz's alleged representation to Mr. Lipitz that "he already had those materials," the Lipitzes were required to provide the disclosures. It cannot be said that Hurwitz prevented the Lipitzes from performing their obligations under the contract; Mr. Lipitz, on his own accord, crossed out the HOA addenda that were required under the Act. This gave Hurwitz the right to cancel the contract.

The Lipitzes cite *Market Street Assocs. Ltd. Partnership v. Frey*, 941 F.2d 588 (7th Cir.1991), an opinion written by Judge Richard A. Posner, for the legal proposition that "the doctrine of good faith is to forbid the kinds of opportunistic behavior that a mutually dependent, cooperative relationship might enable in the absence of rule" and that "[a] party who hokes up a phony defense to the performance of his contractual duties and then when that defense fails (at some expense to the other party) tries on another defense for size can properly be said to be acting in bad faith." *Id.* at 595. Here, however, Hurwitz has not hoked up a phony defense. He relies on a statute that very clearly governs the facts of this case. Both parties were represented by real estate brokers and have no justifiable reason to plead ignorance of law—as we have discussed, the contract submitted by Hurwitz unmistakably flagged the Lipitzes' obligation to make the disclosures and communicated the possible consequences if they did not. The facts as pleaded by the Lipitzes do not come close to supporting a conclusion that Hurwitz failed to satisfy any duty owed to the Lipitzes. Especially in a case where *the burden is on the seller* to comply with the disclosure provisions in the Act, Hurwitz's conduct, although decidedly opportunistic according to the facts as set out in the complaint, does not rise to the level of bad faith.

The Lipitzes also rely on *Geoffrey E. Macpherson, Ltd. v. Brinecell, Inc.*, 98 F.3d 1241 (10th Cir.1996). In that case, Macpherson purchased a unit of liquid purification equipment from Brinecell. *Id.* at 1243. The contract provided that: "If [the equipment] does not absolutely thrill you with its overall performance, return it in good order, freight collect, for immediate refund of your $15,000." *Id.* The parties agreed that unsatisfactory test results permitted Macpherson to return the machine within 45 days for a full refund. *Id.*
Macpherson sent the machine to Brinecell by airplane and it

> arrived in Salt Lake City, addressed to Brinecell and bearing Macpherson's return address. The invoice displayed both the way-bill number and the flight number that Macpherson had faxed to Brinecell, but the invoice incorrectly

listed the shipment's contents as "embroidery machine spares." Based on this error, Brinecell refused to accept the shipment.

*Id.* at 1244. The Court concluded that this refusal to accept the shipment violated Brinecell's duty to contract in good faith. It reasoned:

> Pursuant to the duty of good faith and fair dealing under Utah law, the parties to a contract constructively promise not to intentionally impair the other party's right to receive the fruits of the contract. . . . [Here] Macpherson informed Brinecell of the expected return date of the equipment, the exact way-bill number, and the number of the flight carrying the Model 201 from England. The invoice received by Brinecell lists Macpherson as the shipper, the way-bill number and the flight number. Acting in good faith, anyone in Brinecell's place would have known what was contained in the package or, at least, inquired of Macpherson. Brinecell neither accepted the shipment nor contacted Macpherson and offers no excuse for its inaction. This is such a clear breach of the duty to perform the contract in good faith that no reasonable jury could have decided the issue in Brinecell's favor.

*Id.* at 1245–46.

This factual scenario is not at all like the one before us. In the *Brinecell* case, Brinecell had no right, contractual, statutory, or otherwise, to refuse the package from Macpherson. Brinecell, in the words of Judge Posner, "hoke[d] up a phony defense to the performance of his contractual duties," *see Frey,* 941 F.2d at 595, by using the mislabeled package as an excuse to evade the contract. In essence, Brinecell attempted to make the labeling of the package a material term in the contract, when it obviously was not. This is the type of extreme factual scenario that the doctrine of good faith and fair dealing is designed to address. In our case, however, Hurwitz exercised a statutory right to cancel the contract. It was the Lipitzes whom did not conform to the requirements of the Act; it was this failure to conform with the Act that

allowed Hurwitz to exercise his option to cancel the contract. Hurwitz did not fabricate his defense out of thin air; the grounds for his cancellation were set out clearly in the Act, which both parties, represented by real estate agents, should have been keenly aware of. Hurwitz's conduct does not amount to a violation of the implied duty of good faith and fair dealing.

**THE JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE COUNTY IS AFFIRMED.**

**APPELLANTS TO PAY COSTS.**